Opinion
WERDEGAR, J.
This case presents a challenge under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)[1] to the approval by defendant Exposition Metro Line Construction Authority (Expo Authority) of a project to construct a light-rail line running from Culver City to Santa Monica. Once completed, the transit line is to be operated by real party in interest Los Angeles County Metropolitan Transportation Authority (MTA).
Plaintiff Neighbors for Smart Rail (Neighbors) contends the Expo Authority’s environmental impact report (the EIR) for the project is deficient in two respects: (1) by exclusively employing an analytic baseline of conditions in the year 2030 to assess likely impacts on traffic congestion and air quality, the EIR fails to disclose the effects the project will have on existing environmental conditions in the project area; and (2) the EIR fails to incorporate mandatory and enforceable mitigation measures for potentially significant spillover parking effects in the neighborhoods of certain planned rail stations.
We agree with Neighbors on its first claim, but not on its second. (1) While an agency has the discretion under some circumstances to omit environmental analysis of impacts on existing conditions and instead use only a baseline of projected future conditions, existing conditions “will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant.” (Cal. Code Regs., tit. 14, § 15125, subd. (a).) A departure from this norm- can be justified by substantial evidence that an analysis based on existing conditions would tend to be misleading or without informational value to EIR users. Here, however, the Expo Authority fails to demonstrate the existence of such evidence in the administrative record. (2) The EIR’s mitigation measure for spillover parking effects satisfied CEQA’s requirements by including enforceable mandates for actions by MTA and the Expo Authority, as well as planned actions to be implemented by the municipalities responsible for parking regulations on streets near the planned rail stations. (§ 21081, subd. (a); Cal. Code Regs., tit. 14, § 15091.)
*446 Although we conclude the EIR fails to satisfy CEQA’s requirements in the ' first respect .claimed, we also conclude the agency’s abuse of discretion was nonpr'ejudicial. Under the particular facts of this case, the agency’s examination of certain environmental impacts only on projected year 2030 conditions, and not on existing environmental conditions, did not deprive the agency or the public of substantial relevant information on those impacts. (Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection (2008) 44 Cal.4th 459, 485-486 [80 Cal.Rptr.3d 28, 187 P.3d 888].) We will therefore affirm the judgment of the Court of Appeal, which affirmed the superior court’s denial of Neighbors’s petition for writ of mandate.
Factual and Procedural Background
Formally known as phase 2 of the Exposition Corridor Transit Project (Expo Phase 2), the project at issue consists of a light-rail transit line running from, a station in Culver City (the western terminus of phase 1, which connects to downtown Los Angeles), through the Westside area of the City of Los Angeles, to a terminus in Santa Monica. The project’s purpose is to provide high-capacity transit service between the Westside area of Los Angeles and Santa Monica, thereby accommodating population and employment growth in the area, improving mobility for the large population of transit-dependent Westside residents, providing an alternative to the area’s congested roadways, and enhancing access to downtown Los Angeles, Culver City, Santa Monica, and other destinations in the corridor.
The Expo Authority issued a notice of preparation of an EIR for Expo Phase 2 in February 2007, circulated a draft EIR for public comment in January 2009, and published its final EIR in December 2009. In February 2010, it certified the EIR’s compliance with CEQA, selected the transit mode and route recommended in the EIR, and approved the Expo Phase 2 project.
Neighbors petitioned the superior court for a writ of mandate, alleging the Expo Authority’s approval of Expo Phase 2 violated CEQA in several respects. The superior court denied the petition in full, and the Court of Appeal affirmed, rejecting all of Neighbors’s CEQA claims on the merits. We granted Neighbors’s petition for review, which raised only two issues: the propriety of the Expo Authority’s exclusive use of a future conditions baseline for assessment of the project impacts on traffic and air quality, and the adequacy of the mitigation measure the Expo Authority adopted for possible impacts on street parking near planned transit stations. We resolve those two issues below.
*447 Discussion
I. Use of Future Conditions as a Baseline for Analysis of Project Impacts[2]
The fundamental goal of an EIR is to inform decision makers and the public of any significant adverse effects a project is likely to have on the physical environment. (§21061; Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova (2007) 40 Cal.4th 412, 428 [53 Cal.Rptr.3d 821, 150 P.3d 709].) To make such an assessment, an EIR must delineate environmental conditions prevailing absent the project, defining a baseline against which predicted effects can be described and quantified. (Communities for a Better Environment v. South Coast Air Quality Management Dist. (2010) 48 Cal.4th 310, 315 [106 Cal.Rptr.3d 502, 226 P.3d 985] (Communities for a Better Environment).) The question posed here is whether that baseline may consist solely of conditions projected to exist absent the project at a date in the distant future or whether the EIR must include an analysis of the project’s significant impacts on measured conditions existing at the time the environmental analysis is performed.
The Expo Authority’s chosen analytic method and its stated reasons for that choice will be described in detail below; suffice it here to say the agency first projected the traffic and air quality conditions that would exist in the project area in the year 2030, then estimated the effect that operation of the Expo Phase 2 transit line would have on those conditions at that future time. With regard to traffic delays due to the rail line crossing streets at grade, the EIR found some adverse effects were likely in 2030, but none rising to a level deemed significant. With regard to air quality, no adverse effects were projected to occur; the project was expected to have a generally beneficial impact on air quality by slightly reducing automobile travel in the study area in comparison with conditions otherwise expected in 2030.
Neighbors contends the Expo Authority proceeded contrary to CEQA’s commands, thus abusing its discretion as a matter of law (§ 21168.5), in its choice of a baseline for analysis of traffic and air quality impacts. The Expo Authority and the MTA contend agencies have discretion to choose future conditions baselines if their choice is supported by substantial evidence, as the Expo Authority’s choice assertedly was here.[3] We first ask whether an *448 agency’s discretion ever extends to use of a future conditions baseline to the exclusion of one reflecting conditions at the time of the environmental analysis. Concluding that existing conditions is the normal baseline under CEQA, but that factual circumstances can justify an agency departing from that norm when necessary to prevent misinforming or misleading the public and decision makers, we then ask whether the administrative record here contains substantial evidence of such circumstances.
A. Use of Future Conditions Baselines Generally
For the proposition that the baseline for an EIR’s significant impacts analysis must reflect existing conditions, Neighbors relies heavily on section 15125, subdivision (a) of the CEQA guidelines (CEQA Guidelines or Guidelines),[4] which provides; “An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant.” (Cal. Code Regs., tit. 14, § 15125, subd. (a), italics added (Guidelines section 15125(a)).)
In Communities for a Better Environment, we relied on Guidelines section 15125(a) and CEQA case law for the principle that the baseline for an agency’s primary environmental analysis under CEQA must ordinarily be the actually existing physical conditions rather than hypothetical conditions that could have existed under applicable permits or regulations. (Communities for a Better Environment, supra, 48 Cal.4th at pp. 320-322.) Applying this principle, we held the air pollution effects of a project to expand a petroleum refinery were to be measured against the existing emission levels rather than against the levels that would have existed had all the refinery’s boilers operated simultaneously at their maximum permitted capacities. (Id. at pp. 322-327.)
*449 In a separate part of the Communities for a Better Environment analysis, we addressed the problem of defining an existing conditions baseline in circumstances where the existing conditions themselves change or fluctuate over time, as the refinery’s operations and emissions assertedly did. (Communities for a Better Environment, supra, 48 Cal.4th at pp. 327-328.) We concluded that despite the CEQA Guidelines’ reference to “the time the notice of preparation is published, or if no notice of preparation is published, ... the time environmental analysis is commenced” (Guidelines, § 15125(a)), “[n]either CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the existing conditions baseline. Rather, an agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence.” (Communities for a Better Environment, at p. 328.)
Communities for a Better Environment provides guidance here in its insistence that CEQA analysis employ a realistic baseline that will give the public and decision makers the most accurate picture practically possible of the project’s likely impacts. (Communities for a Better Environment, supra, 48 Cal.4th at pp. 322, 325, 328.) It did not, however, decide either the propriety of using solely a future conditions baseline or the standard of review by which such a choice is to be judged. Our holding that the analysis must measure impacts against actually existing conditions was in contrast to the use of hypothetical permitted conditions, not projected future conditions. And our holding that agencies enjoy discretion to choose a suitable baseline, subject to review for substantial evidence, related to the choice of a measurement technique for existing conditions, not to the choice between an existing conditions baseline and one employing solely conditions projected to prevail in the distant future.
Justice Baxter therefore errs in citing Communities for a Better Environment for the proposition that an agency’s future baseline choice is valid if it is “a realistic measure of the physical conditions without the proposed project . . . .” (Conc. & dis. opn. of Baxter, J., post, at p. 470.) In Communities for a Better Environment, we held an agency’s discretionary decision on “exactly how the existing physical conditions without the project can most realistically be measured” is reviewed for substantial evidence supporting the measurement method. (Communities for a Better Environment, supra, 48 Cal.4th at p. 328, italics added.) We did not hold or imply agencies enjoy equivalent discretion under CEQA and the CEQA Guidelines to omit all analysis of the project’s impacts on existing conditions and measure impacts only against conditions projected to prevail 20 or 30 years in the future, so long as their projections are realistic.
*450 Nor does the concurring and dissenting opinion’s citation to Cherry Valley Pass Acres & Neighbors v. City of Beaumont (2010) 190 Cal.App.4th 316 [118 Cal.Rptr.3d 182] aid its argument. (Conc. & dis. opn. of Baxter, J., post, at p. 469.) The cited decision merely applied Communities for .a Better Environment to determine that a water allocation approximating the property’s recent historical use constituted a realistic measure of existing conditions. (Cherry Valley Pass Acres & Neighbors v. City of Beaumont, supra, 190 Cal.App.4th at pp. 337-338.) The case has nothing to say about an agency’s decision to omit an existing conditions analysis and employ solely a baseline of conditions in the distant future.
The Courts of Appeal, however, have since addressed the future conditions baseline question directly in Sunnyvale West Neighborhood Assn. v. City of Sunnyvale City Council (2010) 190 Cal.App.4th 1351 [119 Cal.Rptr.3d 481] (Sunnyvale West), Madera Oversight Coalition, Inc. v. County of Madera (2011) 199 Cal.App.4th 48 [131 Cal.Rptr.3d 626], and Pfeiffer v. City of Sunnyvale City Council (2011) 200 Cal.App.4th 1552 [135 Cal.Rptr.3d 380] (Pfeiffer), as well as in the present litigation.
In Sunnyvale West, the appellate court held inadequate an EIR’s analysis of a road extension project’s traffic impacts because it used projected conditions in the year 2020 as its only baseline, even though EIR preparation began in 2007 and the project was approved in 2008. (Sunnyvale West, supra, 190 Cal.App.4th at pp. 1358, 1360, 1370.) While acknowledging that Guidelines section 15125(a) and our decision in Communities for a Better Environment provided agencies discretion on how best to measure existing conditions, the court concluded “nothing in the law authorizes environmental impacts to be evaluated only against predicted conditions more than a decade after EIR certification and project approval.” (Sunnyvale West, at p. 1380.) The use of a single future conditions baseline was per se a violation of CEQA; it was not a discretionary choice that could be justified by substantial evidence. (Sunnyvale West, at p. 1383.)
The Sunnyvale West court observed that, although in its view the baseline for analysis of a project’s direct impacts must be existing conditions, “discussions of the foreseeable changes and expected future conditions . . . may be necessary to an intelligent understanding of a project’s impacts over time and full compliance with CEQA.” (Sunnyvale West, supra, 190 Cal.App.4th at p. 1381.) In particular, the effects of the project under predicted future conditions, themselves projected in part on the assumption that other approved or planned projects will proceed, are appropriately considered in an EIR’s analysis of cumulative impacts (see Cal. Code Regs., tit. 14, § 15130) or in a discussion comparing the project to the “no project alternative” (id., § 15126.6, subd. (e)). (Sunnyvale West, at pp. 1381-1382.) *451 So long as the EIR evaluated the project’s significant impacts on existing conditions, the court saw “no problem” with also examining the effect on projected future conditions “where helpful to an intelligent understanding of the project’s environmental impacts.” (Id. at p. 1382.)
The court in Madera Oversight Coalition, Inc. v. County of Madera, considering the adequacy of an EIR’s discussion of a mixed-use property development’s traffic impacts, followed Sunnyvale West on the baseline question. Without extensive additional statutory analysis, the court adopted from Sunnyvale West the rule that agencies “do not have the discretion to adopt a baseline that uses conditions predicted to occur on a date subsequent to the certification of the EIR.” (Madera Oversight Coalition, Inc. v. County of Madera, supra, 199 Cal.App.4th at p. 90.)
In Pfeiffer, a different panel of the same court that decided Sunnyvale West reviewed the EIR for a medical center’s expansion project. The EIR’s analysis of traffic impacts compared, for various road segments and intersections in the project’s vicinity, existing traffic conditions with various growth and project scenarios. (Pfeiffer, supra, 200 Cal.App.4th at p. 1571.) Holding the plaintiffs had not shown this analysis inadequate under CEQA, Pfeiffer distinguished Sunnyvale West as involving the use of only a future conditions baseline, whereas in Pfeiffer “the traffic baselines included in the EIR were not limited to projected traffic conditions in the year 2020, but also included existing conditions and the traffic growth anticipated from approved but not yet constructed developments.” (Pfeiffer, at p. 1573.)
The appellate court in the present case flatly disagreed with the Sunnyvale West analysis. Noting that Guidelines section 15125(a) states the EIR’s description of existing environmental conditions “ ‘normally’ ” serves as the baseline for analysis of project impacts, the court reasoned that “[t]o state the norm is to recognize the possibility of departure from the norm” and concluded the Sunnyvale West court erred in finding in the law an absolute rule against use of projected future conditions as the baseline. In the lower court’s view, future conditions are properly used as a baseline if the projections on which they are based are reliable and their use “provide[s] information that is relevant and permits informed decisionmaking,”
We conclude CEQA and the Guidelines dictate a rule less .restrictive than Sunnyvale West’s but more restrictive than that articulated by the Court of Appeal below. Projected future conditions may be used as the sole baseline for impacts analysis if their use in place of measured existing conditions—a departure from the norm stated in Guidelines section 15125(a)—is justified by unusual aspects of the project or the surrounding conditions. That the future conditions analysis would be informative is insufficient, but an agency *452 does have discretion to completely omit an analysis of impacts on existing conditions when inclusion of such an analysis would detract from an EIR’s effectiveness as an informational document, either because an analysis based on existing conditions would be uninformative or because it would be misleading to decision makers and the public.
Before addressing the use of a future conditions baseline, we pause to clarify some potentially confusing aspects of the standard analysis, in which the project’s impacts are assessed against existing environmental conditions. First, although most projects for which an EIR is prepared do not yet exist or are not yet in operation at the time the EIR is written, it is common for an EIR’s impacts analysis to assume, counterfactually, that the project exists and is in full operation at the time the environmental analysis is conducted. (See, e.g., Gilroy Citizens for Responsible Planning v. City of Gilroy (2006) 140 Cal.App.4th 911, 916-917, 933 [45 Cal.Rptr.3d 102] [EIR analyzed impacts on city’s existing central business district of developing proposed outlying retail center]; Association of Irritated Residents v. County of Madera (2003) 107 Cal.App.4th 1383, 1389, 1393-1394 [133 Cal.Rptr.2d 718] [EIR analyzed impacts on wildlife of replacing existing farm fields with proposed dairy operation]; cf. 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2013) Significant Environmental Effects, § 13.21, p. 635 (rev. 3/13) [EIR must analyze significant effects of entire project, including phases to be implemented later].) In such an analysis, the EIR attempts to predict the impacts a project would have on the existing environment if approved and implemented. CEQA’s wording reflects the fact that projects generally are not yet operating when an EIR is prepared: an EIR must be prepared for any project “that may have” a significant environmental effect (§ 21100, subd. (a)); the report’s purpose is to inform the public and decision makers as to the effects a proposed project “is likely to have” on the environment (§ 21061); and the “environment” referred to is the set of physical conditions in the area “which will be affected” by the project (§ 21060.5).
Second, we note that in appropriate circumstances an existing conditions analysis may take account of environmental conditions that will exist when the project begins operations; the agency is not strictly limited to those prevailing during the period of EIR preparation. An agency may, where appropriate, adjust its existing conditions baseline to account for a major change in environmental conditions that is expected to occur before project implementation. In so adjusting its existing conditions baseline, an agency exercises its discretion on how best to define such a baseline under the circumstance of rapidly changing environmental conditions. (Communities for a Better Environment, supra, 48 Cal.4th at p. 328.) As we explained in our earlier decision, CEQA imposes no “uniform, inflexible rule for determination of the existing conditions baseline,” instead leaving to a sound exercise of *453 agency discretion the exact method of measuring the existing environmental conditions upon which the project will operate. (48 Cal.4th at p. 328.) Interpreting the statute and regulations in accord with the central purpose of an EIR—“to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment” (§ 21061)—we find nothing precluding an agency from employing, under appropriate factual circumstances, a baseline of conditions expected to obtain at the time the proposed project would go into operation.
For example, in an EIR for a new office building, the analysis of impacts on sunlight and views in the surrounding neighborhood might reasonably take account of a larger tower already under construction on an adjacent site at the time of EIR preparation. For a large-scale transportation project like that at issue here, to the extent changing background conditions during the project’s lengthy approval and construction period'are expected to affect the project’s likely impacts, the agency has discretion to consider those changing background conditions in formulating its analytical baseline. Contrary to Justice Baxter’s view (conc. & dis. opn. of Baxter, J., post, at p. 476), such a date-of-implementation baseline does not share the principal problem presented by a baseline of conditions expected to prevail in the more distant future following years of project operation—it does not omit impacts expected to occur during the project’s early period of operation.
Is it ever appropriate for an EIR’s significant impacts analysis to use conditions predicted to prevail in the more distant future, well beyond the date the project is expected to begin operation, to the exclusion of an existing conditions baseline? We conclude agencies do have such discretion. The key, again, is the EIR’s role as an informational document. To the extent a departure from the “norm[j” of an existing conditions baseline (Guidelines, § 15125(a)) promotes public participation and more informed decisionmaking by providing a more accurate picture of a proposed project’s likely impacts, CEQA permits the departure. Thus an agency may forgo analysis of a project’s impacts on existing environmental conditions if such an analysis would be uninformative or misleading to decision makers and the public.[5]
*454 Parenthetically, we stress that the burden of justification articulated above applies when an agency substitutes a future conditions analysis for one based on existing conditions, omitting the latter, and not to an agency’s decision to examine project impacts on both existing and future conditions. As the Sunnyvale West court observed, a project’s effects on future conditions are appropriately considered in an EIR’s discussion of cumulative effects and in discussion of the no project alternative. (Sunnyvale West, supra, 190 Cal.App.4th at pp. 1381-1382.)[6] But nothing in CEQA law precludes an agency, as well, from considering both types of baseline—existing and future conditions—in its primary analysis of the project’s significant adverse effects. (Pfeiffer, supra, 200 Cal.App.4th at p. 1573; Woodward Park Homeowners Assn., Inc. v. City of Fresno (2007) 150 Cal.App.4th 683, 707 [58 Cal.Rptr.3d 102].) The need for justification arises when an agency chooses to evaluate only the impacts on future conditions, foregoing the existing conditions analysis called for under the CEQA Guidelines.
The need to justify omission of an existing conditions analysis derives in part from the CEQA Guidelines, which clearly establish that the norm for an EIR is analysis against a baseline of existing conditions. In addition to Guidelines section 15125(a), which expressly so provides, the Guidelines provide that an EIR “should normally limit its examination to changes in the existing physical conditions in the affected area,” considering both direct and indirect effects and “giving due consideration to both the short-term and long-term effects” of the project. (Cal. Code Regs., tit. 14, § 15126.2, subd. (a), italics added.) Moreover, the Guidelines explain that “[t]he no project alternative analysis is not the baseline for determining whether the proposed project’s environmental impacts may be significant, unless it is identical to the existing environmental setting analysis which does establish that baseline (see Section 15125).” (Cal. Code Regs., tit. 14, § 15126.6, subd. (e)(1).) While the latter regulation does not absolutely prohibit the use of a future conditions baseline where appropriate, it makes clear that normally the baseline for determining a project’s significant adverse impacts is not the same as the no project alternative, which takes into account future changes in the environment reasonably expected to occur if the project is not approved. (Id., subd. (e)(2), (3)(C).)
*455 The CEQA Guidelines establish the default of an existing conditions baseline even for projects expected to be in operation for many years or decades. That a project will have a long operational life, by itself, does not justify an agency’s failing to assess its impacts on existing environmental conditions. For such projects as for others, existing conditions constitute the norm from which a departure must be justified—not only because the CEQA Guidelines so state, but because using existing conditions serves CEQA’s goals in important ways.
Even when a project is intended and expected to improve conditions in the long term—20 or 30 years after an EIR is prepared—decision makers and members of the public are entitled under CEQA to know the short- and medium-term environmental costs of achieving that desirable improvement. These costs include not only the impacts involved in constructing the project but also those the project will create during its initial years of operation. Though we might rationally choose to endure short- or medium-term hardship for a long-term, permanent benefit, deciding to make that tradeoff requires some knowledge about the severity and duration of the near-term hardship. An EIR stating that in 20 or 30 years the project will improve the environment, but neglecting, without justification, to provide any evaluation of the project’s impacts in the meantime, does not “giv[e] due consideration to both the short-term and long-term effects” of the project (Cal. Code Regs., tit. 14, § 15126.2, subd. (a)) and does not serve CEQA’s informational purpose well. The omission of an existing conditions analysis must be justified, even if the project is designed to alleviate adverse environmental conditions over the long term.
In addition, existing environmental conditions have the advantage that they can generally be directly measured and need not be projected through a predictive model. However sophisticated and well designed a model is, its product carries the inherent uncertainty of every long-term prediction, uncertainty that tends to increase with the period of projection. For example, if future population in the project area is projected using an annual growth multiplier, a small error in that multiplier will itself be multiplied and compounded as the projection is pushed further into the future. The public and decision makers are entitled to the most accurate information on project impacts practically possible, and the choice of a baseline must reflect that goal.
Finally, use of existing conditions as a baseline makes the analysis more accessible to decision makers and especially to members of the public, who may be familiar with the existing environment but not technically equipped to assess a projection into the distant future. As an amicus curiae observes, “[ajnyone can review an EIR’s discussion of current environmental *456 conditions and determine whether [it] comports with that person’s knowledge and experience of the world.” But “[i]n a hypothetical future world, the environment is what the statisticians say it is.” Quantitative and technical descriptions of environmental conditions have a place in CEQA analysis, but an agency must not create unwarranted barriers to public understanding of the EIR by unnecessarily substituting a baseline of projected future conditions for one based on actual existing conditions. (See Laurel Heights Improvement Assn. v. Regents of University of California (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278] [EIR allows the public to “know the basis on which its responsible officials either approve or reject environmentally significant action,” thereby promoting “informed self-government”].)
Justice Baxter’s concurring and dissenting opinion proposes a significantly more lax rule, similar to that espoused by the Court of Appeal below, under which a future conditions baseline may be employed, in lieu of one based on existing environmental conditions, so long as it is “a realistic measure of the physical conditions without the proposed project” projected at the agency’s chosen future date. (Conc. & dis. opn. of Baxter, J., post, at p. 470.) As discussed earlier, such a rule cannot be derived from Communities for a Better Environment or the other authority cited for it. Moreover, it would drain Guidelines section 15125(a)’s last sentence (providing that existing environmental conditions “will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant”) of virtually all prescriptive effect. Perhaps most important, it would sanction the unwarranted omission of information on years or decades of a project’s environmental impacts and open the door to gamesmanship in the choice of baselines.
Under" the rule proposed in Justice Baxter’s opinion, agencies evaluating projects intended to exist and operate for many decades could seemingly choose a baseline of conditions from any period of the project’s expected operations, 15, 30 or 60 years in the future, so long as the agency’s projections were supported by reasonably reliable data and predictive modeling. Existing environmental conditions would constitute the “normal[]” baseline for an EIR (Guidelines § 15125(a))—except for any case where the agency chose a different baseline. Agencies would be empowered routinely to omit discussion of short- and medium-term operational effects, preparing EIRs that told the public and decision makers only what impacts could be expected decades down the road. An agency that wished to hide significant adverse impacts expected to occur in the project’s initial years of operation could choose to analyze the project’s environmental effects only at some more distant period, when changes in background conditions might mask or swamp the adverse effects seen in the shorter term. That no intentional hiding *457 of likely impacts appears in this case does not negate the potential for manipulation of the baseline under a rule that provides agencies unbounded discretion in the choice.
Contrary to Justice Baxter’s claim, our holding here does not impose any “wasteful” or “additional” substantive requirement on agencies. (Conc. & dis. opn. of Baxter, J., post, at p. 478.) We hold only that agencies normally must do what Guidelines section 15125(a) expressly requires—compare the project’s impacts to existing environmental conditions, as that term is broadly understood, to determine their significance. The question we would have an agency ask in choosing a baseline is not, “Would an existing conditions analysis add information to a future conditions analysis?” It is, “Do we have a reason to omit the existing conditions analysis and substitute one based on future conditions?” Of course, where an agency concludes an analysis of impacts on future conditions is also needed in any portion of the EIR, it may include such an analysis. But any duplication of effort therein involved is 'not a product of this decision.
For all these reasons, we hold that while an agency preparing an EIR does have discretion to omit an analysis of the project’s significant impacts on existing environmental conditions and substitute a baseline consisting of environmental conditions projected to exist in the future, the agency must justify its decision by showing an existing conditions analysis would be misleading or without informational value. Sunnyvale West Neighborhood Assn. v. City of Sunnyvale City Council, supra, 190 Cal.App.4th 1351, and Madera Oversight Coalition, Inc. v. County of Madera, supra, 199 Cal.App.4th 48, are disapproved insofar as they hold an agency may never employ predicted future conditions as the sole baseline for analysis of a project’s environmental impacts.
Because the standard articulated here involves a primarily factual assessment, the agency’s determination is reviewed only for substantial evidence supporting it. (Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra, 40 Cal.4th at p. 435.) If substantial evidence supports an agency’s determination that an existing conditions impacts analysis would provide little or no relevant information or would be misleading as to the project’s true impacts, a reviewing court may not substitute its own judgment on this point for that of the agency. (Ibid.)
B. The Expo Authority’s Use of a Year 2030 Baseline
1. Traffic congestion analysis
As proposed in the EIR, the Expo Phase 2 project will cross several streets at grade rather than with bridges or tunnels. To analyze the resulting impacts on traffic congestion, the Expo Authority used the following method:
*458 (1) For numerous street intersections in the vicinity, the agency directly observed existing congestion in 2007 and 2008, measuring it as the average delay in travel through each intersection during the morning and afternoon peak travel periods. The delay was expressed in terms of “Level of Service” (LOS), ranging from LOS A (free flow) to LOS F (extreme congestion).[7]
(2) Using MTA’s traffic projection model, which incorporates regional growth projections from the Southern California Association of Governments, the Expo Authority predicted the LOS for each intersection in the year 2030 if the Expo Phase 2 project is not built (and assuming no other transit improvements along the project corridor).
(3) For each intersection studied,, the Expo Authority then predicted the LOS in the year 2030 if the Expo Phase 2 project is built and operated. These projections took into account automobile trip reductions expected to result from the project and additional peak hour trips to drop off or pick up passengers at stations, as well as the impact of stoppages at grade crossings as each train passes.
(4) For each intersection, the predicted year 2030 LOS with the project was compared to the predicted year 2030 LOS without the project and the significance of any impact assessed. An adverse impact on delay was considered significant if the project was projected to cause service to deteriorate from LOS A, B, C, or D to LOS E or F or, for those intersections projected to be at LOS E or F in 2030 without the project, if the project would increase delay by four seconds or more.
Using this method, the EIR projects some additional local traffic congestion in 2030 due to the project, but none rising above the significance thresholds just described. For example, at the intersection of Stewart Street and Olympic Boulevard, vehicles in the year 2030 are expected to experience a morning peak period delay of 34.2 seconds absent the project and 49 seconds with the project, but this 14.8-second increase in delay is not considered significant because it only moves the intersection from LOS C to LOS D, and not into the unsatisfactory categories of LOS E and F. At 20th Street and Olympic Boulevard, the project is expected to cause an additional 0.8 seconds of delay, considered insignificant because it does not change the projected LOS, which is expected to be unsatisfactory (LOS E) in 2030 even without the project, and falls below the four-second significance threshold. Several other intersections fit these patterns of insignificant adverse impact, *459 while at many other intersections the project is projected to reduce traffic delay in 2030, due in part to intersection improvements proposed in conjunction with the transit line.
2. Air pollution analysis
Based on projections of an increase in vehicle miles traveled in the region, the EIR predicts an increase in air pollution emissions by 2030 if the Expo Phase 2 project is not built. The project would result in fewer vehicle miles traveled, in comparison to the no-build alternative, and hence in fewer emissions in 2030. By reducing vehicle travel and the resulting emissions below those otherwise expected, project implementation “would have a beneficial impact on regional pollutant levels over the life of the project.”
3. Explanation of baseline choice
In the introduction to the EIR’s factual findings, the Expo Authority explains that it found use of a future conditions baseline for traffic and air quality impacts analysis necessary “so that the public and the decision makers may understand the future impacts on traffic and air quality of approving and not approving the project.” The EIR continues; “The evaluation of future traffic and air quality conditions utilizes adopted official demographic and [szc] projections for the project area and region. Past experience with the adopted demographic projections indicate that it is reasonable to assume that the population of the project area and the region will continue to increase over the life of the project. The projected population increases will, in turn, result in increased traffic congestion and increased air emissions from mobile sources in the project area and in the region, [f] For most of the environmental topics in the [EIR] and in these Findings, the Authority finds that existing environmental conditions are the appropriate baseline condition for the purpose of determining whether an impact is significant. However, the Authority finds that the existing physical environmental conditions (current population and traffic levels) do not provide a reasonable baseline for the purpose of determining whether traffic and air quality impacts of the Project are significant. The Authority is electing to utilize the future baseline conditions for the purposes of determining the significance of impacts to traffic and air quality.”
Further explanation of the baseline choice is provided in a later section on the EIR’s methods for determining impacts; “A transportation project includes significant capital infrastructure and is intended to meet long-term needs. As a result, the permanent effects of those transportation projects are, and should be, evaluated based on a longer-term perspective that takes *460 increases in population and programmed changes to the transportation system into account. Since the project is addressing both existing and long-term transportation shortfalls, that longer-term perspective should include reasonably foreseeable other improvements, [f] For this project the long-term permanent impacts are evaluated against what is [sic] expected to be existing conditions in 2030. This assumes the planned growth (jobs and employment) and related funded transportation improvements as proposed in the [Southern California Association of Governments Regional Transportation Plan]. In addition, short-term impacts associated with the construction period (2011 to 2015) of the project have also been evaluated, [f] . . . Because population and traffic are anticipated to increase over the life of the project, this approach provides the public and decision makers with a realistic evaluation of the significance of air quality and traffic impacts over the life of the project.”
The Expo Authority’s explanation of its baseline choice in its briefing places similar reliance on the inevitability of population and traffic growth in the project area: “It is undisputed that the population, employment and concomitant traffic congestion will continue to increase through 2030 on the west side. [Citation.] It is absurd to suggest that the Authority use 2007 population, employment and traffic to determine the Project’s operational impacts when the 2007 conditions will no longer exist when the Project is fully operational.”
4. Propriety of baseline choice
We discern no substantial evidence supporting the Expo Authority’s decision to omit an analysis of the project’s traffic and air quality impacts on existing environmental conditions. Although the agency did not expressly find an existing conditions analysis would have been misleading or without informational value, its finding that for analysis of traffic congestion and air pollution impacts “existing physical environmental conditions ... do not provide a reasonable baseline” may be construed as so asserting. Unfortunately, nothing in the record supports that determination, and without such evidence the Expo Authority cannot justify its decision to completely omit an analysis of the project’s impacts on existing traffic congestion and air quality.
The Expo Authority observes that “2007 conditions will no longer exist when the Project is fully operational.” As discussed earlier, CEQA allows an agency to adjust its existing conditions baseline to account for an important change that will occur between the time an EIR is prepared and the time of project implementation. (See pt. I.A., ante.) But the Expo Authority did not measure traffic congestion and air pollution impacts against existing environmental conditions when the project begins operations. The agency used no existing conditions baseline, adjusted or unadjusted, for analysis of these impacts, instead employing only a baseline of projected 2030 conditions.
*461 That the Expo Phase 2 project is “intended to meet long-term needs” for public transportation is an insufficient justification. By focusing solely on the project’s operational impacts in the distant future, the EIR neglects to inform the public and decision makers explicitly of any operational impacts that could occur in the project’s first 15 years of operation. (The only short-term impacts on traffic and air quality analyzed were those resulting from the project’s construction.) The absence of such “due consideration to both the short-term and long-term effects” of the project (Cal. Code Regs., tit. 14, § 15126.2, subd. (a)) threatens to deprive the EIR’s users of the opportunity to weigh the project’s environmental costs and benefits in an informed manner.
Similarly, that project area population, traffic, and emissions of air pollutants are expected to continue increasing through and beyond 2030 does not justify the agency’s failure to analyze operational impacts under earlier conditions. The expectation of change may make it important for the agency to also examine impacts under future conditions (whether in the significant impacts analysis, the cumulative impacts analysis, or the discussion of the no project alternative), but it does not constitute substantial evidence supporting a determination that an existing conditions analysis would be uninformative or misleading.
Nor does the fact ridership is not expected to reach maximum levels immediately upon the transit line’s opening constitute substantial evidence justifying the failure to examine impacts on existing conditions.[8] The level of ridership on the proposed transit line is a characteristic of the project in operation, not a characteristic of the environmental baseline against which project impacts are measured. As noted earlier, an existing conditions analysis often assumes the project exists and is in full operation at the time the environmental analysis is conducted, measuring the likely impacts against a baseline of conditions existing at the time of environmental analysis. Thus the Expo Authority did not need to employ a baseline of predicted 2030 background conditions in order to measure the impacts of full ridership; those likely impacts could have been predicted against an existing conditions baseline. Justice Baxter’s concurring and dissenting opinion, in suggesting the *462 year 2030 baseline was chosen as representative of full ridership, ignores the fact that ridership is not a baseline condition but a characteristic of the project’s operations. (Conc. & dis. opn. of Baxter, J., post, at p. 473.) In any event, neither the EIR nor the Expo Authority’s briefs, nor Justice Baxter’s opinion explains whether ridership levels would affect the project’s impacts on traffic congestion and air pollution, and if so, whether the effect would be positive or negative; the likelihood of changing ridership levels thus cannot be considered substantial evidence an existing conditions analysis—whatever ridership level it assumed—would be useless or misleading.
In its brief, the Expo Authority states it “chose 2030 because when it issued the [notice of preparation of the EIR] in 2007, 2030 was the planning horizon for transportation projects in the adopted [Southern California Association of Governments] Regional Transportation Plan,” and asserts that federal law requires the use of this long-term perspective in planning for federally funded transportation projects. To the extent the agency is arguing that a technique used for planning under another statutory scheme necessarily satisfies CEQA’s requirements for analysis of a project’s impacts, we disagree. Except where CEQA or the CEQA Guidelines tie CEQA analysis to planning done for a different purpose (see, e.g., § 21081.2, subd. (a) [CEQA findings on traffic impacts not required for certain residential infill projects that are in compliance with other municipal plans and ordinances]), an EIR must be judged on its fulfillment of CEQA’s mandates, not those of other statutes. And while we try to interpret CEQA in a manner consistent with other planning schemes (see Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra, 40 Cal.4th at pp. 432-434), no issue of conflict or incompatibility arises here. Nothing prevents an agency preparing an EIR from analyzing the impacts of a project against an existing conditions baseline even if the agency has also planned under other statutes for the project’s long-term operation. Moreover, the use of multiple baselines for direct impacts analysis does not violate CEQA (see Pfeiffer, supra, 200 Cal.App.4th at p. 1573; Woodward Park Homeowners Assn., Inc. v. City of Fresno, supra, 150 Cal.App.4th at p. 707), and even when the EIR uses solely an existing conditions baseline for direct impacts analysis, available information about the longer term impacts of the project, together with other foreseeable developments, is appropriately incorporated into the EIR under the rubric of a cumulative impacts analysis (Cal. Code Regs., tit. 14, § 15130). There is thus no necessary connection between use of a year 2030 horizon for transportation planning generally and the agency’s choice of conditions in that year as the sole baseline for project impacts analysis under CEQA.
In summary, the administrative record does not offer substantial evidence to support the Expo Authority’s decision to limit its analysis of project impacts on traffic congestion and air quality to predicted impacts in *463 the year 2030, to the exclusion of likely impacts on conditions existing when the EIR was prepared or when the project begins operation.
5. Prejudice
An omission in an EIR’s significant impacts analysis is deemed prejudicial if it deprived the public and decision makers of substantial relevant information about the project’s likely adverse impacts. Although an agency’s failure to disclose information called for by CEQA may be prejudicial “regardless of whether a different outcome would have resulted if the public agency had complied” with the law (§ 21005, subd. (a)), under CEQA “there is no presumption that error is prejudicial” (§ 21005, subd. (b)): Insubstantial or merely technical omissions are not grounds for relief. (Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection, supra, 44 Cal.4th at pp. 485-486.) “A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.” (Kings County Farm Bureau v. City of Hanford (1990) 221 Cal.App.3d 692, 712 [270 Cal.Rptr. 650].)
With regard to the analysis of Expo Phase 2’s traffic congestion impacts, we conclude the EIR’s use exclusively of a future conditions baseline had no such prejudicial effect. Although the EIR failed to analyze the project’s impacts on existing traffic congestion, it did include an extensive analysis of year 2030 congestion effects, finding no significant adverse impacts. That detailed analysis demonstrates the lack of grounds to suppose the same analysis performed against existing traffic conditions would have produced any substantially different information.
The EIR revealed that project impacts on congestion at intersections along the chosen rail route are expected in most cases to be favorable in 2030, that most of the adverse impacts expected are small, and that even the few relatively large adverse impacts expected would not, if applied to existing conditions, result in significant changes in delay status.[9] Although Neighbors has argued that intersections expected to reach unsatisfactory status by 2030 without the project might do so earlier because of project impacts, the EIR *464 showed that those intersections would experience favorable, or in one instance adverse but very minor, impacts in 2030 due to the project.[10] Design changes reducing delay are built into the project at many intersections, and the expected gradual increase in traffic generally could not reasonably be thought likely to result in. substantially larger project impacts on congestion under existing conditions than under 2030 conditions.[11] In these particular factual circumstances, the EIR’s omission did not “preclude[] informed decisionmaking and informed public participation.” (Kings County Farm Bureau v. City of Hanford, supra, 221 Cal.App.3d at p. 712.)
We reach the same conclusion as to the analysis of air quality impacts. Based on the prediction that operation of the Expo Phase 2 project would reduce the vehicle miles traveled in the project area and hence reduce emissions of pollutants, the EIR concluded project implementation “would have a beneficial impact on regional pollutant levels over the life of the project . . . .” But the project will begin reducing vehicle miles travelled as soon as it starts operating, as some of those who would otherwise drive decide to take the new train. Under the EIR’s logic, to which Neighbors raises no objection other than the choice of a baseline, the project’s impact on air quality will thus be beneficial throughout its operation, not only in 2030. The EIR’s formal use of a year 2030 baseline for this analysis was thus an insubstantial, technical error that cannot be considered prejudicial. (Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection, supra, 44 Cal.4th at pp. 486-488.)
To comply fully with CEQA’s informational mandate, the Expo Authority should have analyzed the project’s effects on existing traffic congestion and *465 air quality conditions. Under the specific circumstances of this case, however, its failure to do so did not deprive agency decision makers or the public of substantial information relevant to approving the project, and is therefore not a ground for setting that decision aside.
II. Adequacy of Mitigation Measure for Spillover Parking Effects
As proposed in the EIR, the Expo Phase 2 project does not include construction of parking facilities at several stations. The EIR recognizes that some transit patrons will nevertheless attempt to park near these stations, and near-station streets where parking is neither time limited nor restricted to those with residential permits “could be impacted by spillover parking.” To mitigate this potential impact, the EIR proposed, and the agency adopted, a series of measures. On-street parking in areas where spillover effects are anticipated will be monitored before and for six months after the opening of the transit fine. If a parking shortage results, MTA will help the responsible local jurisdiction establish an appropriate permit parking program, for which MTA will pay the signage and administrative costs. If a permit program is inappropriate for the area, MTA “will work with the local jurisdictions” to decide on another option, such as time-restricted, metered, or shared parking arrangements. By means of this mitigation measure, the EIR concludes, any adverse spillover parking effect will be rendered less than significant.
Neighbors contends this mitigation measure is insufficiently enforceable because it depends on the cooperation of municipal agencies having jurisdiction over parking in the vicinity of the stations. CEQA, however, allows an agency to approve or carry out a project with potential adverse impacts if binding mitigation measures have been “required in, or incorporated into” the project or if “[t]hose changes or alterations are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency.” (§ 21081, subd. (a); see Cal. Code Regs., tit. 14, § 15091, subd. (b) [findings to this effect “shall be supported by substantial evidence in the record”].) The Expo Authority made both findings as to its spillover parking mitigation measure, and both findings are supported by substantial evidence.
Under the adopted mitigation measure, MTA is required to monitor parking in the potentially affected neighborhoods, to pay for a residential permit parking program where station spillover has resulted in a street parking shortage, and to assist in developing other measures where a residential permit program is inappropriate. But as MTA cannot institute street parking restrictions without the cooperation of the local municipalities, some part of the mitigation, to the extent it is needed, will indeed be the responsibility of *466 other pubhc agencies, which “can and should” (§ 21081, subd. (a)(2)) adopt parking programs and restrictions to alleviate pressure from commuters using the new transit line.
Neighbors relies on Federation of Hillside & Canyon Associations v. City of Los Angeles (2000) 83 Cal.App.4th 1252, 1260-1262 [100 Cal.Rptr.2d 301], in which the appellate court found a city’s proposed measures to mitigate the transportation impacts of a general plan framework were inadequate. The transportation plan involved in that case, however, was designed to mitigate the effects of massive population and employment growth planned for the city and would have required $12 billion from various sources, of which the city’s own portion far exceeded its available funds. (Id. at p. 1256.) The city thus “acknowledged in the [mitigation plan] that there was great uncertainty as to whether the mitigation measures would ever be funded or implemented” (id. at p. 1261), leading the court to find no substantial evidence that enforceable mitigation measures had been incorporated into or were required by the project.
The circumstances in Federation of Hillside & Canyon Associations are not comparable to those here, where the mitigation measure at issue involves only the monitoring of parking near several transit stations and, if a shortage develops, the cooperative implementation of one or more relatively low-cost solutions. While the Expo Authority and MTA cannot guarantee local governments will cooperate to implement permit parking programs or other parking restrictions, the record supports the conclusion these municipalities “can and should” (§ 21081, subd. (a)(2)) do so. Neighbors’s speculation a municipality might not agree to a permit parking program—which MTA would pay for and which would benefit the municipality’s own residents—is not sufficient to show the agency violated CEQA by adopting this mitigation measure. (See City of Marina v. Board of Trustees of California State University (2006) 39 Cal.4th 341, 364-365 [46 Cal.Rptr.3d 355, 138 P.3d 692] [the finding that mitigation through sharing the cost of necessary improvements with the responsible agency is infeasible was not justified by speculation that the agency might not agree to undertake the improvements].)
Disposition
The judgment of the Court of Appeal is affirmed.
Kennard, L, and Corrigan, 1, concurred.

 All statutory references are to the Public Resources Code unless otherwise specified.

 With the exception of part I.B.5., post, which addresses prejudice, the analysis in this part (as well as that in pt. II., post) expresses the view of a majority of the court. (See conc. & dis. opn. of Liu, J., post, at pp. 478-480, 481.)

 The Expo Authority also contends Neighbors failed to exhaust the future conditions baseline issue in the administrative forum. The Court of Appeal held the issue exhausted, and the Expo Authority did not raise the exhaustion issue in its answer to Neighbors’s petition for *448 review. As the exhaustion question was not raised in the petition for review or answer, and is not fairly included in the merits of the baseline issue on which we granted review, we decline to address it here. (See Cal. Rules of Court, rule 8.520(b)(3).)

 The CEQA Guidelines, promulgated by the state’s Natural Resources Agency, are authorized by section 21083 and found in title 14 of the California Code of Regulations, section 15000 et seq. By statutory mandate, the Guidelines provide “criteria for public agencies to follow in determining whether or not a proposed project may have a ‘significant effect on the environment.’ ” (§ 21083, subd. (b).) In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous. (Communities for a Better Environment, supra, 48 Cal.4th at p. 319, fn. 4; Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra, 40 Cal.4th at p. 428, fn. 5.)

 Amicus curiae South Coast Air Quality Management District provides a hypothetical example of factual conditions in which use of an existing conditions baseline would arguably mask potentially significant project impacts that would be revealed by using a future conditions baseline. In this illustration, an existing industrial facility currently emits an air pollutant in the amount of 1,000 pounds per day. By the year 2020, if no new project is undertaken at the facility, emissions of the pollutant are projected to fall to 500 pounds per day due to enforcement of regulations already adopted and to turnover in the facility’s vehicle fleet. The operator proposes to use the facility for a new project that will emit 750 pounds per day of the pollutant upon implementation and through at least 2020. An analysis comparing the project’s emissions to existing emissions would conclude the project would reduce pollution and thus, have no significant adverse impact, while an analysis using a baseline of projected year 2020 *454 conditions would show the project is likely to increase emissions by 250 pounds per day, a (presumably significant) 50 percent increase over baseline conditions.

 A cumulative impacts analysis focuses on the effects of the proposed project together with other projects causing related impacts and may rely on projections of future conditions that are expected to contribute to a cumulative adverse effect (Cal. Code Regs., tit. 14, § 15130, subds. (a)(1), (b)), while analysis of the no project alternative includes a discussion of “what would be reasonably expected to occur in the foreseeable future if the project were not approved, based on current plans and consistent with available infrastructure and community services” (Cal. Code Regs., tit. 14, § 15126.6, subd. (e)(2)).

 For signalized intersections, delay at LOS A is less than or equal to 10 seconds, at LOS B it is between 10 and 20 seconds, at LOS C it is between 20 and 35 seconds, at LOS D it is between 35 and 55 seconds, at LOS E it is between 55 and 80 seconds, and at LOS F it is greater than 80 seconds. The LOS thresholds are lower for unsignalized intersections.

 The record does not indicate full ridership will first be achieved in 2030. The passage cited in the Expo Authority’s brief, found in the EIR’s discussion of parking impacts and mitigation along Colorado Avenue, reads as follows: “On opening day, 71 to 92 percent of the 2030 parking demand would be provided depending on the Preferred Alternative selected. This would be reasonably consistent with opening day ridership, which is estimated at approximately 77 percent of the year 2030 forecasts.” While this makes clear ridership on opening day is expected to be below its ultimate maximum, it does not purport to predict how fast ridership will increase or when it will reach its full level, other than assuming that level will be reached by or before the year 2030. From common experience, one might expect fewer than 15 years will be needed for commuters to start using a new transit line.

 For the majority of the more than 100 intersection/peak period combinations studied, the project’s expected impact in 2030 is favorable or nonexistent. Where the predicted impact is adverse, it is generally minor, exceeding 10 seconds in only seven instances. And of the 10 currently satisfactory intersections (those in LOS status A through D) on which the rail project is expected to have the greatest adverse impacts in 2030, including the seven on which the projected 2030 impact exceeds 10 seconds, none are currently close enough to LOS E so that the 2030 impact, if applied to existing conditions, would put the intersection into unsatisfactory status. Only two currently satisfactory intersections are within 10 seconds of the LOS E threshold, and the project is projected to affect delay favorably at both.

 Five intersection/peak period combinations along the proposed transit line meet the criteria of being currently in a satisfactory LOS and projected to turn unsatisfactory by 2030 in the project’s absence. For four of the five, the project’s 2030 impact on congestion is expected to be favorable, reducing delay in amounts ranging from 1.1 seconds to 30.1 seconds. The single projected adverse impact in this group is very small, 0.8 seconds. And since the existing morning peak delay at that intersection (20th Street and Olympic Boulevard) is 42.6 seconds, the adverse project impact under existing conditions would have to be 12.4 seconds, or more than 15 times the adverse impact in 2030, to put the intersection over the 55-second threshold into LOS E. To posit such an extreme difference in impacts would be unsupported speculation.

 The record shows that, baseline conditions aside, the project’s operations may differ somewhat on opening day from later periods, in that ridership on the transit line is expected initially to be only 77 percent of its eventual level. As noted earlier, however, an existing conditions impacts analysis ordinarily assumes, counterfactually, that the project is in full operation. And even if an existing conditions analysis assumed 77 percent ridership, no substantial difference in impacts would be likely. The rail project’s favorable effect on project area traffic is projected to be modest even at full ridership: a reduction of 0.38 percent in vehicle miles traveled in 2030. Even if the 77 percent initial ridership implies that initially the project will reduce vehicle miles traveled only by 0.29 percent, there are no grounds to believe such an extremely minor difference (0.09 percentage points) could substantially alter the project impacts on existing congestion at the individual intersections studied.