Filed 8/6/24  South Fresno Community Alliance v. City of Fresno CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SOUTH FRESNO COMMUNITY ALLIANCE,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF FRESNO, et al.,<br><br>Defendants and Respondents. | F086180<br><br>(Super. Ct. No. 21CECG03237)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

Shute, Mihaly & Weinberger, Ellison Folk, Marlene Dehlinger, Mindy K. Jian; Leadership Counsel for Justice and Accountability, Ashley Werner and Phoebe S. Seaton, for Plaintiff and Appellant.

Andrew Janz, City Attorney, Talia Kolluri, Assistant City Attorney; Aleshire & Wynder, Anthony R. Taylor, John W. Fox, and Michael C. Huston, for Defendants and Respondents.

-ooOoo-

In 2014, the City of Fresno (Fresno or the City) adopted its current general plan.[1] At the same time, it certified completing a Master Environmental Impact Report (MEIR), in compliance with the California Environmental Quality Act (CEQA; Pub. Resources Code,[2] § 21000 et seq.). Five years later, the City proposed amending its general plan to comply with state law[3] while also completing a new Program Environmental Impact Report (PEIR) to continue implementing that plan, i.e., the project in this case. The PEIR included a Greenhouse Gas Reduction Plan Update (Guidelines,[4] § 15183.5). The City indeed, in 2021, amended its general plan and certified completing the new PEIR.

South Fresno Community Alliance (Alliance) filed a petition for writ of mandate in the superior court, challenging the project approval and PEIR's compliance with CEQA. (§§ 21168 & 21168.5.) Alliance raised numerous arguments, generally alleging that Fresno failed "to complete a thorough analysis of the significant adverse impacts of

---

[1] By law, "each city and county must 'adopt a comprehensive, long-term general plan' for its own 'physical development' as well as 'any land outside its boundaries which in the planning agency's judgment bears relation to its planning.' " (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 152.) The general plan essentially becomes " 'the "constitution for all future developments" within the city or county.' " (*Ibid.*)

[2] Undesignated statutory references are to the Public Resources Code.

[3] In 2013, the Legislature enacted Senate Bill No. 743 (Reg. Sess. 2013-2014), which essentially changed the metric for analyzing transportation related impacts from level of service to vehicle miles traveled. This change in law was a major force underlying the new EIR.

[4] Guidelines references are to California Code of Regulations, title 14, section 15000 et. seq. "The CEQA Guidelines …, promulgated by the state Natural Resources Agency …, are statutorily mandated to provide 'criteria for public agencies to follow in determining whether or not a proposed project may have a 'significant effect on the environment." ' (§ 21083, subd. (b).) We give the Guidelines great weight in interpreting CEQA, except where they are clearly unauthorized or erroneous.' " (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 217, fn. 4 (*Fish & Wildlife*).)

[the] General Plan," and by including "vague, nonbinding policies … to reduce [greenhouse gas (GHG)] emissions …."  Fresno, for its part, resisted.

The superior court denied the petition and entered judgment in Fresno's favor.  It concluded Alliance "fail[ed] to challenge the substantive changes to the … General Plan[] and inappropriately challenge[d] the already approved project as a whole, after the time to raise the[] challenges ha[d] long expired."  It also found "there [were] no allegations … asserting that subsequent review of a previously certified EIR [was] required."

Alliance raises numerous issues on appeal, in several of which we find merit.  As explained below, the City failed to properly describe the environmental setting, failed to substantiate its GHG analysis vis-à-vis state targets, improperly deferred air quality mitigation measures, unjustifiably found traffic mitigation infeasible, failed to analyze potential impacts on pedestrians, inadequately addressed groundwater decline, and failed to reasonably discuss project alternatives.  We reverse the judgment and order appropriate relief in the disposition.

## BACKGROUND

When Fresno implemented its current general plan in 2014, it concurrently adopted a MEIR.  The general plan has a "horizon year of 2035."  The plan defines horizon as the "level of development predicted to occur by 2035 …."

In 2019, Fresno proposed adopting a PEIR because a MEIR is legally valid for only five years (§ 21157.6).  In connection with this proposal, the City publicly announced, and described the project as, "updating the existing [MEIR] and converting it to a [PEIR]" with an intention to conform to state law "related to Vehicle Miles Traveled [VMT]" and to update its "Greenhouse Gas Reduction Plan."  These changes would allow Fresno to "continue[] implement[ing]" its general plan and "to streamline [that] implementation … with updated environmental analysis, regulatory framework, and mitigation measures …."

3.

The PEIR analyzed numerous impacts including air quality, GHG emissions, hydrology, and transportation. During the environmental review process required by CEQA, several comments were submitted challenging various portions of the PEIR. Pertinent here, those comments raised concerns with air quality, GHG emissions, hydrology, and transportation.

In September 2021, the Fresno City Council passed resolution Nos. 2021-269 and 2021-270, certifying the City completed the PEIR in compliance with CEQA, and adopted a statement of overriding considerations, approving the general plan amendment. (See Guidelines §§ 15090(a)(1) [certification], 15092 [project approval], 15093 [statement of overriding considerations].) The PEIR and statement of overriding considerations, together, identified GHG emissions and decreased groundwater levels as potentially significant impacts mitigated to less than significant. It also found impacts to air quality and transportation were significant and unavoidable. Finally, it concluded "economic and social considerations outweigh[ed] the remaining environmental effects of approval and implementation of the project."

After the City approved the project, Alliance filed a petition in the trial court seeking a writ of mandate. The petition alleged various CEQA violations: "Us[ing] an inaccurate, incomplete, conflicted and inconsistent project description," "[f]ail[ing] to consider an adequate range of feasible alternatives," "using" an improper "baseline," "[f]ail[ing] to adequately disclose, analyze, or mitigate" impacts relating to "air quality and sensitive populations," "climate change," "cyclists, pedestrians, and transit riders," "and groundwater." Alliance sought to "vacate and set aside" "the PEIR and associated approvals," order compliance with CEQA, declare the PEIR "inadequate," and declare it and the "GHG Plan" insufficient to "streamline" future project analyses.

The City opposed the petition in its entirety, raising several procedural and substantive defenses. The trial court denied the writ petition. It concluded Alliance "fail[ed] to challenge the substantive changes to the project, the 2014 General Plan, and

4.

inappropriately challenge[d] the already approved project as a whole, after the time to raise th[o]se challenges ha[d] long expired."

## DISCUSSION

Alliance raises several issues on appeal.[5] Generally, it contends the PEIR 1) improperly described the project's environmental setting, 2) failed to discuss specific health consequences, 3) inadequately mitigated construction-related dust, 4) unlawfully deferred air quality mitigation, 5) improperly analyzed GHG emissions, 6) failed to mitigate traffic-related impacts, 7) did not mitigate groundwater decline, and 9) inadequately discussed project alternatives. Fresno opposes each point, raising various procedural and substantive arguments. Each party's positions are discussed in further detail below.

As mentioned, we find merit in Alliance's arguments related to environmental setting, GHG analysis, air quality mitigation, traffic mitigation, groundwater mitigation, and project alternatives. Accordingly, we reverse the judgment.

## I. CEQA Overview and Reviewing Standard

" 'The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' [Citation.] 'With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations.]' [Citations.] The basic purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citations.]

---

[5] After we address procedural points, the issues are discussed in the order presented in Alliance's opening brief.

5.

'Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees.' [Citation.] The EIR 'protects not only the environment but also informed self-government.' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511-512, fn. omitted (*Sierra Club*).) "The fundamental goal of an EIR is to inform decision makers and the public of any significant adverse effects a project is likely to have on the physical environment." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 447 (*Neighbors*).)

"The standard of review in a CEQA case, as provided in sections 21168.5 and 21005, is abuse of discretion." (*Sierra Club, supra,* 6 Cal.5th at p. 512.) "While we determine de novo whether [a lead] agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable[.]' " (*Ibid.*)

" 'Substantial evidence challenges are resolved much as substantial evidence claims in any other setting: a reviewing court will resolve reasonable doubts in favor of the administrative decision, and will not set aside an agency's determination on the ground that the opposite conclusion would have been equally or more reasonable. [Citations.] [¶] A claim that an agency failed to act in a manner required by law presents other considerations. Noncompliance with substantive requirements of CEQA *or noncompliance with information disclosure provisions 'which precludes relevant information from being presented to the public agency ... may constitute prejudicial abuse* of discretion within the meaning of Sections 21168 and 21168.5, regardless of whether a

6.

different outcome would have resulted if the public agency had complied with those provisions." [Citation.] ... [W]hen an agency fails to proceed [as CEQA requires], harmless error analysis is inapplicable. The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation. Case law is clear that, in such cases, the error is prejudicial." (*Sierra Club, supra,* 6 Cal.5th at p. 515.)

CEQA does "not require technical perfection or scientific certainty[.]" (*Sierra Club, supra,* 6 Cal.5th at p. 515.) Reviewing courts look " ' " 'not for an exhaustive analysis but for adequacy, completeness[,] and a good-faith effort at full disclosure.' " ' " (*Ibid.*)

## II. Tiering and Program EIRs

"CEQA … permits the environmental analysis for long-term, multipart projects to be 'tiered[.]' " (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 429 (*Vineyard*).) A program EIR "is a type of EIR that agencies often use to examine a broad program or plan that will be followed by more narrow, related projects, which can be analyzed in more focused CEQA documents that 'tier' from the program EIR." (*Save Berkeley's Neighborhoods v. Regents of University of California* (2020) 51 Cal.App.5th 226, 236.) "A tiered EIR is required for a later project consistent with the larger program if the project may cause significant environmental effects that were not examined in the prior EIR." (*Ibid.*)

"[T]he broad overall impacts analyzed in an EIR at the first-tier programmatic level need not be reassessed as each of the project's subsequent, narrower phases is approved, but tiering 'is not a device for deferring the identification of significant environmental impacts that the adoption of a specific plan can be expected to cause.' " (*Vineyard, supra,* 40 Cal.4th at p. 429, fn. omitted.) "Tiering is proper 'when it helps a public agency to focus upon the issues ripe for decision at each level of environmental review and in order to exclude duplicative analysis of environmental effects examined in

previous environmental impact reports.' " (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1170 (*Bay-Delta*).)

"While proper tiering of environmental review allows an agency to defer analysis of certain details of later phases of long-term linked or complex projects until those phases are up for approval, CEQA's demand for meaningful information 'is not satisfied by simply stating information will be provided in the future.' " (*Vineyard, supra,* 40 Cal.4th at p. 431.) " 'Tiering does not excuse the lead agency from adequately analyzing reasonably foreseeable significant environmental impacts of the project and does not justify deferring such analysis to a later tier EIR or negative declaration.' [Citation.] Tiering is properly used to defer analysis of environmental impacts and mitigation measures to later phases when the impacts or mitigation measures are not determined by the first-tier approval decision but are specific to the later phases." (*Ibid.*)

"[T]he sufficiency of a program EIR must be reviewed in light of what is reasonably feasible, given the nature and scope of the project." (*Center for Biological Diversity v. California Department of Conservation, etc.* (2019) 36 Cal.App.5th 210, 230 (*Conservation*).) "The level of specificity required in an EIR is determined by the nature of the project and the rule of reason." (*Fish & Wildlife, supra,* 234 Cal.App.4th at p. 233.)

## III. Procedural Issues

Preliminarily, we first consider Fresno's arguments the PEIR is beyond challenge and that Alliance did not exhaust administrative remedies because it failed to raise certain points during the public review segment mandated by CEQA. We reject each argument.

### A. The PEIR is Subject to Challenge

The City alleges Alliance "does not challenge the PEIR with respect to analysis of a project requiring … approval, but [instead challenges] analysis of [Fresno's] already approved 2014 General Plan as a whole." It concludes Alliance's "challenges are time barred." We disagree.

8.

The City in this case opted to adopt a new EIR when amending its general plan, rather than seeking to extend the MEIR's viability under section 21157.6. That section provides a MEIR "shall not be used" if it was certified "more than five years prior to the filing of an application for [a] subsequent project." (§ 21157.6, subds. (a) & (a)(1).)

An exception exists, however, "if the lead agency reviews the adequacy of the [MEIR] and" either "finds [1)] no substantial changes have occurred with respect to the circumstances under which the [MEIR] was certified or[, 2)] that no new information … has become available" or it "[p]repares an initial study and, pursuant to the" study's findings, either 3) "[c]ertifies a subsequent or supplemental [EIR]," or 4) "[a]pproves a mitigated negative declaration" addressing "substantial changes that have occurred with respect to the circumstances under which the" MEIR was certified. (§ 21157.6, subds. (b) & (b)(1)-(2).) Fresno did not follow this statute in this case, instead opting to adopt a new EIR.

CEQA applies to "project[s] proposed to be carried out or approved …." (§ 21080, subd. (a).) A project includes "amendment of local General Plans …." (Guidelines, § 15378, subd. (a)(1).) Accordingly, the choice to instead adopt an entirely new PEIR when amending its general plan obligated the City to fully comply with CEQA, insofar is it related to the *amended* general plan.[6]

**B. Exhaustion**

Fresno contends Alliance, during CEQA's public review mandate, failed to properly challenge "GHG emissions calculation methodology," mitigation measure "AIR-3.1," and mitigation measure "HYD-2.1." It concludes it "had no opportunity to consider and respond to these [points] at the administrative level and [Alliance] is barred from challenging the PEIR on these grounds" on appeal. We disagree the points were not properly raised below.

---

[6] The amendment did not propose any land use changes.

9.

### i. Additional Background

The PEIR contains several mitigation measures including AIR-3.1 and HYD-2.1. These are discussed in detail *post*. Generally, AIR-3.1 deals with air quality impacts related to certain large "industrial or warehousing land uses" "within a 1,000 feet of a sensitive land use …." HYD-2.1 deals with groundwater depletion.

Throughout the public review process, Alliance submitted multiple, detailed letters objecting to the PEIR. Alliance's various letters asserted the PEIR "fail[ed] to comprehensively address how it will 'ensure conformity' " " 'with the mandates of [the] California Supreme Court in the Newhall Ranch case,' " inadequately mitigated air quality impacts because the mitigation measures were improper, and failed to discuss "current groundwater availability for residential communities and households which rely on domestic wells for their everyday water needs …."

### ii. Analysis

" ' "In order to attack a decision that is subject to CEQA, the alleged grounds for noncompliance must have been presented to the public agency, and the person attacking the decision must have raised some objection during the administrative proceedings. (§ 21177, subds. (a), (b).)" [Citation.] Although an issue must first have been raised during the administrative process to be preserved for judicial review, it may be argued in court by a different person. [Citation.]' [Citation.] ' "[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them." [Citation.] This requirement is known as the exhaustion doctrine. [Citation.] The rationale behind this rule is that the public agency should have the opportunity to receive and respond to articulated factual issues and legal theories before its actions are subjected to judicial review.' " (*Save the Hill Group v. City of Livermore* (2022) 76 Cal.App.5th 1092, 1104-1105.)

Alliance sufficiently raised the GHG methodology, air quality mitigation, and groundwater depletion issues. The reference to "the Newhall Ranch case" is to the

California Supreme Court's seminal decision on GHG methodology: *Center for Biological Diversity v. Department of Fish and Wildlife* (2015) 62 Cal.4th 204 (*Newhall Ranch*). It derives its short cite from the underlying "development called Newhall Ranch."[7] (*Id.* at p. 213.)

Next, while it is true, as Fresno argues, Alliance did not specifically challenge AIR-3.1—instead challenging related air quality mitigation measures—we find it sufficiently preserved the challenge. Without a doubt, Fresno was aware its air quality mitigation measures were challenged as inadequate. The points raised by Alliance relative to the other air quality mitigation measures were identical and the City declined to make any changes to those challenged measures. Because we will also find fault in the related mitigation measures, *post*, there is no practical reason to impose a bar to challenging AIR-3.1. Put simply, the City was " 'fairly apprise[d]' " of the concerns relating to air quality mitigation. (*Preservation Action Council of San Jose v. City of San Jose* (2023) 91 Cal.App.5th 517, 542.)

Last, Fresno was clearly on notice its groundwater mitigation relative to present-day wells was at issue. In sum, there is no exhaustion bar to review any issue in this case.

## IV. Existing Environmental Setting

"[A]n EIR must delineate environmental conditions prevailing absent the project, defining a 'baseline' against which predicted effects can be described and quantified." (*Neighbors, supra,* 57 Cal.4th at p. 447.) Here, Alliance faults the PEIR's environmental setting for "fail[ing] to identify the locations and numbers of sensitive receptors—including schools, day care facilities, and even entire neighborhoods—in and around the areas [] the General Plan targets for industrial expansion." It similarly decries a failure to

---

[7] CEQA litigators, including the parties in this case, and some case law, often refer to this Supreme Court decision as *Newhall Ranch*.

11.

"disclose the localized existing pollution burdens and the disproportionate health impacts faced by residents in these parts of the city."

Fresno suggests "[t]he PEIR accurately and sufficiently describes the environmental setting and baseline for air quality … including sensitive receptors …." Alliance has the better argument.

## A.  Additional Background

The City's general plan establishes policies about future growth for its "Planning Area" which encompasses about 106,000 acres.  The Planning Area includes both land within the city's limits and approximately 33,800 acres in unincorporated areas slated for future growth.  Accordingly, the PEIR describes the existing environmental setting as follows: "The study area for project impact regarding air quality is the City of Fresno Planning Area and proximate sensitive receptors potentially impacted by a project within the Planning Area."  The PEIR notes the study area is within the San Joaquin Valley Air Basin and the regional agency with jurisdiction over air quality in the air basin is the San Joaquin Valley Air Pollution Control District (SJVAPCD).  The baseline date for the existing environment was May 16, 2019.

The PEIR defines "sensitive receptors" as individuals who are sensitive to air pollution including children, the elderly, and persons with preexisting respiratory or cardiovascular illness.  It also refers to the SJVAPCD characterizing sensitive receptors as locations housing or attracting children, the elderly, people with illnesses, or other who are especially sensitive to air pollutants.  Examples given are residences, schools, hospitals, and convalescent facilities.

The PEIR also mentions the Air Quality Land Use Handbook's statement describing sensitive land uses as homes, medical facilities, daycare centers, schools, and playgrounds.  Finally, the PEIR states "[t]here are many sensitive receptors throughout the city …."

12.

Alliance, in a comment letter, pointed out the PEIR "include[d] no description about the location of existing sensitive receptors which may be exposed to air pollution …." Specifically, it asked Fresno to "identify the location of sensitive receptors in relation to areas designated for industrial and warehouse development and other land uses which may be expected to generate substantial quantities of toxic air contaminants as well as to roadways expected to experience high volumes of diesel truck traffic and car traffic …." Alliance's letter also asserted the PEIR did not describe the existing, localized pollution to "vulnerable communities" in "South Fresno[.]"

In response, Fresno stated "[p]rogrammatic analysis [could not] include an identification of the location of all existing sensitive receptors …." It added that the PEIR "include[d] a detailed discussion regarding the South Central [Community Emissions Reduction Plan (CERP)]," which itself contained an "analysis describing the sources of pollution impacting [South Fresno], as well as the location of sensitive receptors" in the area.

The PEIR does include a section about the "South Central Fresno CERP." It explains the CERP was adopted by the California Air Resources Board and describes "the sources of pollution impacting" South Fresno, including the sensitive receptors in the area. Its purpose is "to focus on reducing" air pollution and emissions in South Central Fresno.

**B. Analysis**

An EIR "must include a description of the physical environmental conditions in the vicinity of the project. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant. The description of the environmental setting shall be no longer than is necessary to provide an understanding of the significant effects of the proposed project and its alternatives. The purpose of this requirement is to give the public and decision

13.

makers the most accurate and understandable picture practically possible of the project's likely near-term and long-term impacts."[8]  (Guidelines, § 15125(a).)

"If the description of the environmental setting ' "is inaccurate, incomplete or misleading, the EIR does not comply with CEQA.  [Citation.]  'Without accurate and complete information pertaining to the setting of the project and surrounding uses, it cannot be found that the [EIR] adequately investigated and discussed the environmental impacts of the development project.' " ' " (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 17 Cal.App.5th 413, 439-440 (*San Diego*).)  "The fact more precise information may be available during the next tier of environmental review does not excuse [a lead agency] from providing what information it reasonably can now." (*Id.* at p. 440.)  "While foreseeing the unforeseeable is not possible, an agency must use its best efforts to find out and disclose all that it reasonably can." (Guidelines, § 15144.)

Alliance here asked Fresno to include information in the PEIR regarding sensitive receptors in South Fresno.  Fresno declined, claiming it could not identify "all existing sensitive receptors …."  The claim is not supported by substantial evidence, because Fresno simultaneously acknowledged sensitive receptors in South Fresno were identified in the CERP.[9]  The CERP is not a substitute for information in the PEIR.[10]  The error by

---

[8] A future baseline is appropriate if "justified by unusual aspects of the project or the surrounding conditions." (*Neighbors, supra,* 57 Cal.4th at p. 451.)

[9] The CERP is included in the record on appeal and indeed contains a map identifying sensitive receptors throughout Fresno.

[10] The PEIR discusses the CERP.  It does not, however, meaningfully describe sensitive receptors or the pollution in South Fresno.  In sum, it states the CERP "was adopted by [the California Air Resources Board]" in 2019 "and [was] now in the implementation phase.  The CERP includes a technical analysis describing the sources of pollution impacting the community, as well as the location of sensitive receptors within the community.  Sources of pollution that are of particular concern to South Central Fresno are highlighted, and possible strategies for reducing pollution impacts from these sources are evaluated."

14.

omission, however, is not prejudicial. Alliance has not articulated any prejudice relating to the omission, simply stating instead the omission "precluded ' informed decisionmaking ….' " We reject the blanket statement. Notably, we find no other error in the environmental setting description.

## V. Air Quality Impacts

An EIR must "make[] a reasonable effort to substantively connect a project's air quality impacts to likely health consequences." (*Sierra Club, supra,* 6 Cal.5th at p. 510.) Alliance asserts the PEIR "fails to meet this standard."

Specifically, Alliance contends the PEIR unreasonably assumes greater analysis relative to air quality impacts was not possible. For example, it criticizes using an incorporated-by-reference brief from the San Joaquin Valley Air Pollution Control District (SJVAPCD) in 2015 to supply an explanation in the PEIR that "currently available modeling tools are not equipped to provide a meaningful analysis …." Fresno responds by claiming the PEIR "expressly explains" its limited analysis and "supports [the] explanation with substantial evidence." We agree for two reasons.

First, the SJVAPCD brief was properly incorporated by reference. (Guidelines, § 15150.) That brief indeed explains why a more meaningful analysis is not possible for "localized health impacts associated with" air quality impacts.[11]

Second, while it is true the SJVAPCD brief was authored—as Alliance points out—several years prior to the PEIR in this case, there is no evidence its analysis relative to analyzing air quality impacts is outdated. Alliance bears the burden to demonstrate otherwise, and it has failed to discharge that burden. (*Santa Rita Union School District v. City of Salinas* (2023) 94 Cal.App.5th 298, 332 [EIRs are presumed correct and

---

[11] The SJVAPCD brief cites difficulties including "wind transport," "[m]etereology, the presence of sunlight, and other complex chemical factors," and the simple fact current models are regional in nature, i.e., "not accurate when applied at the local level."

challenger bears burden of proving error].)  The PEIR conclusion no further analysis was possible is supported by substantial evidence.[12]

## VI. Construction Related Dust Mitigation

The PEIR concludes "fugitive dust impacts from construction are … less than significant" due to mandated compliance with SJVAPCD "Regulation VIII …."  Alliance suggests the conclusion "is based on flawed reasoning" because the regulation itself acknowledges it " 'may not be sufficient to reduce project specific emissions to less than significant levels' " in every instance.

Fresno argues the context in which the PEIR analyzes "construction-related fugitive dust impacts" is "implementation of the General Plan …."  In other words, it argues "[f]ugitive dust impacts are inherently variable, and analysis of such impacts will vary according to project."  We agree with Fresno that the PEIR properly concludes dust impacts are less than significant at the *program* level.

### A.  Additional Background

A SJVAPCD document entitled "Guidance for Assessing and Mitigating Air Quality Impacts" describes Regulation VIII as "requiring actions to prevent, reduce or mitigate anthropogenic fugitive dust emissions."  It highlights "measures to control fugitive dust" and notes "compliance with … Regulation VIII substantially reduces project specific fugitive dust emissions, [but] may not be sufficient to reduce project specific emissions to less than significant levels."  It later restates this qualifier, stating certain projects may "warrant additional … reductions necessary to minimize dust emissions to less than significant levels."

Rule 8021, part of Regulation VIII, lists the requirements for abating dust.  These measures include utilizing water, "wind barriers," controlling vehicles, and ceasing

---

[12] Similarly, the PEIR explains toxic emissions are controlled by permits issued by SJVAPCD, rendering it impossible to forecast those emissions and associated risk.

activity when dust exceeds a certain threshold. The rule also requires a "Dust Control Plan" whenever construction "will include 10 acres or more of disturbed surface area for residential developments, or 5 acres or more of disturbed surface area for non-residential development, or will include moving, depositing, or relocating more than 2,500 cubic yards per day of bulk materials on at least three days."

The PEIR also includes mitigation measure "AIR-2.1[.]" This mitigation measure requires "future discretionary project[s]" to "prepare and submit … a technical assessment evaluating potential project construction phase-related air quality impacts," including dust. If the assessment reveals "the potential to exceed … SJVAPCD" thresholds, projects must incorporate additional mitigation measures to reduce emissions.

### B. Analysis

Regulation VIII and AIR-2.1 combine to support the PEIR's conclusion "fugitive dust impacts from construction are … less than significant." Fresno correctly points out the PEIR is focused on implementing the city's general plan, and not a specific, concrete development. The conclusion dust impacts are less than significant is proper at the program level. (*Conservation, supra,* 36 Cal.App.5th at p. 230; *Fish & Wildlife, supra,* 234 Cal.App.4th at p. 233.)

Dust mitigation—Regulation VIII and AIR-2.1—will apply broadly to all future projects within the city.[13] To the extent some projects might demand additional mitigation, the mitigation measures sufficiently capture the outliers: additional mitigation is necessary to remain within the SJVAPCD threshold level.[14]

---

[13] Alliance does not argue the dust mitigation measures are vague, nonbinding, or deferred.

[14] Alliance asserts no "threshold of significance specific to fugitive dust exists …." Our review, however, reveals otherwise. Regulation VIII equates "fine particulate matter" to "fugitive dust emissions" and there is indeed a performance standard for fine particulate matter in the record.

## VII.  Air Quality Mitigation

Next, Alliance believes the PEIR "improperly defer[s] mitigation of air quality impacts" and "fails to justify its rejection of feasible measures that would mitigate air quality impacts."  We address each in turn.

### A.  Deferring Specific Details of Mitigation

" 'Formulation of mitigation measures shall not be deferred until some future time.'  [Citation.]  'However, the specific details of a mitigation measure … may be developed after project approval when it is impractical or infeasible to include those details during the project's environmental review provided that the agency (1) commits itself to the mitigation, (2) adopts specific performance standards the mitigation will achieve, and (3) identifies the type(s) of potential action(s) that can feasibly achieve that performance standard and that will [be] considered, analyzed, and potentially incorporated in the mitigation measure.'  [Citations.]  Where an EIR improperly defers mitigation, the approving agency abuses its discretion by failing to proceed as required by law." (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 518-519 (*Golden Door*), quoting Guidelines, § 15126.4, subd. (a)(1)(B).)

Alliance suggests the PEIR's three air quality mitigation measures—described below—"unlawfully defer[]" mitigation because "they [] lack objective performance standards[] and [] include a menu of 'possible' mitigating actions," inviting discretion "without requiring" any particular reductions.  Fresno argues the measures are compliant with the law; we disagree, as explained below.

#### i.  Additional Background

The PEIR contains, as pertinent, three air quality mitigation measures—AIR-2.1, 2.2, and 3.1.  Measure AIR-2.1 applies to future, proposed project "construction phase-related air quality impacts."  It states that "[i]f construction related air pollutants are determined to have the potential to exceed the SJVAPCD-adopted threshold of significance," then project applicants are required to "incorporate mitigation measures

18.

into construction plans to reduce air pollutant emissions during construction activities." It then lists several possible measures, for example, "power supply meters … whenever feasible," restricting equipment and vehicle idling, limiting vehicle routes, and removing vegetation only as necessary.

AIR-2.2 is modeled identically to AIR-2.1 but applies to "operation-related air quality impacts." "If operation-related air pollutants are determined to have the potential to exceed the SJVACPD-adopted thresholds of significance," then project applicants are required to "incorporate mitigation measures to reduce air pollutant emissions during operational activities." It also includes possible mitigation measures, including "demonstrat[ing] an adequate number of electrical service connections," "consider[ing] energy storage," restricting equipment and vehicle idling, installing electric vehicle chargers, maximizing "solar panels," optimizing paint colors to reflect heat, and maximizing tree planting.

AIR-3.1 applies to "new industrial or warehousing [projects] that[] have the potential to generate 100 or more truck trips per day or have 40 or more trucks with operating diesel-powered transport refrigeration units[] and [] are within 1,000 feet of a sensitive land use (e.g., residential, schools, hospitals, or nursing homes) …." These projects are required to "submit a Health Risk Assessment [] to the City …." If the assessment "shows that the incremental health risks exceed their respective thresholds, as established by the SJVAPCD at the time a project is considered," then applicants must "identify and demonstrate best available control technologies … to reduce [those] risks to an acceptable level." The measure includes such potential technologies.

### ii. Analysis

The air quality mitigation measures—AIR-2.1, 2.2, and 3.1—do not comply with Guidelines section 15126.4 because they fail to mandate reduction at a specific level. In general, we agree identifying specific details for air quality mitigation at the program level is appropriately deferred because there are no individual projects currently

19.

proposed. We also agree the measures in this case commit to mitigation and identify performance standards. Where the air quality mitigation measures fall short, however, is in their consistent failure to demand measurable reductions to achieve those standards.

AIR-2.1 and 2.2 simply require "measures to reduce air pollutant emissions …." AIR-3.1 requires reductions "to an acceptable level." These "generalized goal[s]" violate CEQA as they do not "ensure the mitigation goal," i.e., emissions below SJVAPCD thresholds, "will be achieved." (See *Golden Door, supra,* 50 Cal.App.5th at pp. 519-520.)

While it is certainly likely the PEIR intended and meant to require reducing emissions below SJVAPCD thresholds, as presently worded it simply does not require that reduction. In other words, there is no standard "which could be corrected in a court mandamus proceeding." (*Sierra Club, supra,* 6 Cal.5th at p. 526.) "Simply stating a generalized goal for mitigating an impact does not allow the measure to qualify" as a deferred mitigation measure. (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 856 (*King & Gardner*).) In sum, "reduc[ing] air pollutant emissions" and "reduc[ing] risks to an acceptable level" are not objectively enforceable standards.[15]

---

[15] Relatedly, Alliance points out mandating mitigation measures only when " 'absolutely necessary' " or " 'feasible' " is not permissible. While true, because the issue in this case involves deferred mitigation, the measure need only identify "potential action(s) that can feasibly achieve" the performance standard. (Guidelines, § 15126.4, subd. (a)(1)(B).) The identified actions are not final and, because the relief granted in the disposition includes setting aside the project's approval and accompanying certifications, Fresno may ensure its listed potential actions are not vague and do not invite discretion, e.g., failing to define "adequate" in "demonstrate an adequate number of electrical service connections …." (See *Golden Door, supra,* 50 Cal.App.5th at pp. 520-521 [mitigation must contain "objective and measurable standard for what 'feasible' " means]; *King & Gardiner, supra,* 45 Cal.App.5th at p. 862 [mitigation must be enforceable through objective standard]; *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 793-794 [lead agency's satisfaction is not an objective standard].)

## B. Rejecting Proposed Mitigation

During relevant comment periods, both SJVAPCD and Alliance recommended additional air quality impact mitigation. Fresno declined to adopt any additional mitigation measures relative to air quality.

Alliance now asserts Fresno "fail[ed] to justify its rejection of feasible measures that would mitigate air quality impacts." Fresno responds by claiming SJVAPCD merely offered suggestions—not actual mitigation measures—but does not explicitly address Alliance's proposed mitigation. We conclude Fresno's responses to the various comments at issue were adequate.

### i. Additional Background

Consistent with law, Fresno solicited public comment on the PEIR prior to its certification. (See, generally, § 21092.) Both SJVAPCD and Alliance commented on the PEIR's air quality mitigation.

SJVAPCD made several suggestions regarding mitigation. Relevant here, it suggested adding "language" to the general plan to establish a "policy" to "reduce vehicle miles traveled []." Similarly, it recommended "guidance supported by policy requiring future development projects to evaluate heavy-duty truck routing patterns to help limit emission exposure to residential communities and sensitive receptors." Further, it asked the City to "assess the emission reductions measures and strategies contained in the CERP, and address them … as appropriate." It also offered specific changes to AIR-2.1 and 2.2, e.g., requiring "the cleanest reasonably available off-road construction fleets and practices" and implementing "zero and near-zero [emissions] technologies[.]"

Alliance pointed out several mitigation measures promulgated by the Attorney General in a "document [en]titled 'Warehouse Projects: Best Practices and Mitigation Measures to Comply with the California Environmental Quality Act.' " It asked Fresno to "review the mitigation measures contained in the document and incorporate them as appropriate …."

21.

The City rejected every proposal.  It declined to modify mitigation measures AIR-2.1 and 2.2 because "individual development projects" were "currently unknown" and the measures already required "applicants to prepare a technical assessment" analyzing air quality impacts "prior to approval[.]"  In declining to add language to the general plan to combat VMT, Fresno replied the general plan already "include[d] several policies to reduce VMT …."  Responding to the suggestion that Fresno analyze and incorporate CERP strategies, the City stated "revisions to the … General Plan … [were] limited to specific changes related to VMT and compliance with legislative updates."  It also noted the general plan "include[d] several policies and objectives that direct coordination with the SJVAPCD to achieve compliance with State and federal air quality standards," and the facts mitigation measures AIR-3.1 and 3.2 required projects to prepare "Health Risk Assessment" reports, and abide by "buffer" distances when "siting … sensitive land uses to avoid incompatibilities with the [California Air Resources Board's] recommended Air Quality and Land Use Handbook."

Relating to a "policy for heavy-duty truck routing analysis," Fresno reiterated it was simply amending the general plan to adopt new VMT standards, AIR-2.2 already captured "[t]ruck routing patterns and … emissions," and "updated guidance on VMT analysis," i.e., the amendments to the general plan, would also apply.  Finally, responding to Alliance's suggestion to incorporate mitigation measures promulgated by the Attorney General, the City stated "[t]he measures suggested by [Alliance] may be appropriate at the project level when specific impacts are anticipated to occur as a direct result of … future actions.  …  However, because there [was] not enough information regarding future projects to quantify emissions at [the] time, it [could not] be determined whether potential impacts could be reduced to less-than-significant levels."

### ii. Analysis

"CEQA provides that public agencies should not approve a project if there are feasible mitigation measures that would substantially lessen the significant environmental

effects of the project. [Citation.] An agency may reject a mitigation measure if it finds it to be infeasible. [Citation.] A feasible mitigation measure is one that is capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, legal, and technological factors." (*Covington v. Great Basin Unified Air Pollution Control Dist.* (2019) 43 Cal.App.5th 867, 878 (*Covington*).)

"A lead agency must evaluate comments to a … EIR and prepare written responses that describe the disposition of any 'significant environmental issue' raised. [Citation.] Where a significant environmental issue is raised, the lead agency must address the concern 'in detail giving reasons why specific comments and suggestions were not accepted. There must be good faith, reasoned analysis in response. Conclusory statements unsupported by factual information will not suffice.' [Citation.] The level of detail in the response may correspond to the level of detail in the comment, so that a general response is sufficient to a general comment, but a more detailed response is needed for a more detailed comment. [Citation.] The EIR 'must respond to specific suggestions for mitigating a significant environmental impact unless the suggested mitigation is facially infeasible. [Citations.] While the response need not be exhaustive, it should evince good faith and a reasoned analysis.' " (*Covington, supra,* 43 Cal.App.5th at pp. 878-879.) "[A]n agency need not", however, " 'adopt every nickel and dime mitigation scheme brought to its attention or proposed in the project EIR,' but it must incorporate 'feasible mitigation measures' 'when such measures would "substantially lessen" a significant environmental effect.' " (*Id.* at p. 879.) Nor need it analyze " ' " 'every *imaginable* alternative or mitigation measure.' " ' " (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 935.)

The responses to comments in this case were not unreasoned or in bad faith. While it is true Fresno declined every suggestion at issue, that itself does not evidence bad faith or unreasonableness.

The comments in this case were undoubtedly detailed and full. Fresno's response to each suggestion fully considered the comment and fully responded to it. In general, Fresno explained the suggestions were duplicative or overlapped with already existing general plan policies or involved unwarranted speculation. "CEQA does not require a lead agency to conduct every test or perform all research, study, and experimentation recommended or demanded by commentors." (Guidelines, § 15204, subd. (a); *Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 512 *(Cleveland)*.)

For example, because it is unknown how exactly the city will develop, Fresno believed it was unclear whether the specific mitigation Alliance proposed—the Attorney General's warehouse recommendations—would effectively reduce air quality impacts. (Cf. *Sierra Club, supra,* 6 Cal.5th at p. 515 [CEQA does not demand perfection or scientific certainty].) That response is reasonable and in good faith. As to specific modifications to AIR-2.1 and 2.2 suggested by SJVAPCD, Fresno noted final mitigation measures were yet to be determined. This is consistent with its decision to defer specific, detailed mitigation. (See **VII., A.,** *ante*, Guidelines, § 15126.4.)

We find no error in Fresno's responses. These challenges lack merit.

## VIII. Greenhouse Gas (GHG) Issues

A primary purpose underlying the PEIR was Fresno's decision to update its GHG emissions reduction plan, permitting it to streamline GHG analysis for future projects. Alliance contends the GHG "analysis and proposed mitigation measure[s] do not comply with CEQA." It raises five distinct points to support the contention.

First, Alliance believes the GHG analysis is fundamentally flawed because it assumes "statewide reduction target percentages can be directly used to calculate [Fresno] emission goals." Second, it faults Fresno for failing "to analyze … GHG emissions over the lifetime of the [p]roject[.]" Third, it claims the GHG analysis is faulty because it is based on an improper method.

24.

Fourth, Alliance asserts "[t]he GHG mitigation measures are vague and unenforceable." Fifth, it argues the GHG plan is insufficient to allow "streamlining future development" pursuant to Guidelines section 15183.5, subdivision (b).

We find merit in Alliance's challenge to the GHG plan's faulty assumption regarding statewide reduction targets. That faulty assumption undermines the plan's use in streamlining analysis. We reject the remaining contentions.

### A. Additional Background

"In June 2005, Governor Schwarzenegger signed Executive Order No. S-3-05, which set overall greenhouse gas emissions reduction targets for California. [Citation.] The Executive Order established three general benchmarks: (1) reduce emissions to 2000 levels by 2010; (2) reduce emissions to 1990 levels by 2020; and (3) reduce emissions to 80 percent below 1990 levels by 2050." (*Cleveland, supra,* 3 Cal.5th at p. 504.) "In 2006, shortly after the Executive Order was issued, the Legislature enacted the California Global Warming Solutions Act of 2006 (Stats. 2006, ch. 488, adding Health & Saf. Code, § 38500 et seq.), commonly known as Assembly Bill No. 32 (2005–2006 Reg. Sess.). Assembly Bill No. 32 partially adopted the Executive Order's goals by directing [California Air Resources Board] to 'determine what the statewide greenhouse gas emissions level was in 1990, and approve in a public hearing, a statewide greenhouse gas emissions limit that is equivalent to that level, to be achieved by 2020.' " (*Cleveland, supra,* at p. 505.)

"[T]he Legislature in 2016 enacted Senate Bill No. 32 (SB 32) (2015–2016 Reg. Sess.), adding Health and Safety Code section 38566, which adopts a goal of reducing greenhouse gas emissions by 40 percent below 1990 levels by the year 2030. This 40 percent reduction is widely acknowledged as a necessary interim target to ensure that California meets its longer-range goal of reducing greenhouse gas emissions to 80 percent below 1990 levels by the year 2050." (*Cleveland, supra,* 3 Cal.5th at pp. 518-519.)

The PEIR explains the "GHG Reduction Plan" in this case "includes strategies to reduce greenhouse gas emissions that align with State targets." It projects emissions for the years 2020, 2030, and 2035. To calculate projected emissions, the plan assumed "[b]usiness-as-usual" scenarios, i.e., "without any further action[s] to reduce" GHG emissions, and looks forward "using population, households, and employment growth rate[s] from" a previously calculated Fresno County growth projection.[16] Emissions are grouped by "[s]ector" as follows: transportation, commercial energy, residential energy, fugitive emissions, solid waste, industrial energy, and agriculture.

An adjusted business-as-usual reduction is next calculated by "appl[ying] emission reductions achieved by Statewide regulations, programs, and measures" and subtracting those reductions from the business-as-usual projections. A "[s]tate-aligned target" is then calculated for 2020, 2030, and 2035 by applying a rote percentage reduction for each year consistent with the state's goal for each year.[17] Fresno then concludes additional reductions are necessary to meet the State's goal-emission-reduction in 2030 and 2035. The PEIR then discusses additional reductions from "local measures," including "the development of [a] land use pattern and transportation system envisioned by the … General Plan, enforcement of City ordinances and design standards, and direct reductions from energy conservation projects, and alternative fuels use." With these additional reductions, the PEIR concludes Fresno will meet and exceed the State's goal-emission-reduction in 2030 and 2035.

The PEIR acknowledges the 2035 goal keeps the city on a path to achieve the 2050 goal. The GHG Reduction Plan notes "[t]he 2035 forecast year correspond[s] to

---

[16] The growth projection is from the "Fresno Council of Governments" in 2017.

[17] The state does not have a 2035 goal; it instead has a 2050 goal established by executive order. (*Cleveland, supra,* 3 Cal.5th at p. 504.)

the … General Plan horizon and will allow [Fresno] to develop long-term strategies to continue GHG reductions."

The PEIR states "the General Plan growth rate would result in buildout by the year 2056, [but] given current methods and the State's goals and targets, 2035 is a reasonable forecast for GHG [analysis] and is in-line with State emission reduction targets." It then introduces mitigation measure "GHG-1.1."

GHG-1.1 states, in full:

> "Prior to the City's approval of subsequent discretionary projects, the Director of the City Planning and Development Department, or designee, shall confirm that development projects are consistent with the … GHG Reduction Plan … and shall implement all measures deemed applicable to the project through the GHG Reduction Plan []-Project Consistency Checklist …."

The PEIR concludes GHG mitigation will result in a "[l]ess [t]han [s]ignifiant [i]mpact" on the environment from the city's GHG emissions.

The checklist is included in the Plan, which is an appendix to the PEIR. It is intended "to help [Fresno] provide a streamlined review process for new development projects that are subject to discretionary review pursuant to … Guidelines [s]ection 15183.5." "Projects that meet the requirements of th[e] [c]hecklist will be deemed to be consistent with the Fresno GHG Reduction Plan … and will be found to have a less than significant contribution to cumulative GHG" emissions. "Projects that do not meet the requirements in th[e] [c]hecklist will be deemed to be inconsistent with the Fresno GHG Reduction Plan … and must prepare a project-specific analysis of GHG emissions, including quantification of existing and projected GHG emissions and incorporation of the measures in th[e] [c]hecklist to the extent feasible." The checklist specifically "[n]ote[s] that not all the measures in the checklist are applicable to all projects" but "projects should comply with applicable measures …."

27.

The checklist itself is five pages long and separated into three categories: project information, land use consistency, and mitigation consistency. Project information generally seeks background information on the project—size, land use, and a brief description of the project. Land use consistency simply asks if the project is "consistent with the approved General Plan, Specific Plan, and Community Plan planned land use and zoning designations[.]" If a "proposed project is not consistent with the approved planned land use and zoning designation(s), then [applicants must] provide estimated GHG project emissions under both existing and proposed designation(s) for comparison."

If the comparison reveals the proposed project's estimated emissions are equivalent to or less than a conforming land use, "the project's GHG impact is [deemed] less than significant." If, instead, the comparison reveals greater emissions, "the project's GHG impact is [deemed] significant." The applicant must then demonstrate "consistency with applicable [general plan] objectives and policies … or provide analysis and measures to incorporate into the project to bring [estimated] GHG emissions to a level that is less than or equal to the estimated" emissions of a conforming use.

Finally, the checklist seeks consistency with applicable "Land Use and Transportation Demand Strategies," "Electric Vehicle Strategies," "Energy Conservation Strategies," "Water Conservation Strategies," and "Waste Diversion and Recycling Strategies[.]" These strategies cite directly to numerous policies found within the general plan.

## B. Faulty Assumptions; *Newhall Ranch*

The California Supreme Court has held "consisten[cy] with meeting statewide [GHG] emission reduction goals" is an appropriate metric under CEQA. (*Newhall Ranch, supra,* 62 Cal.4th at p. 213.) Alliance contends the PEIR "here improperly assumes that statewide reduction target percentages can be directly used to calculate [Fresno's] emission goals." It also criticizes the PEIR for "assum[ing] that the generalized statewide reduction percentages from the implementation of statewide

28.

measures"—used to calculate adjusted-business-as-usual emissions without additional local reductions—"would result in the same percentage reductions in local GHG emissions."

The City argues "statewide reduction targets [are] proper." It states "the *Newhall Ranch* case" sanctions using "statewide goals" and suggests "comparison to state-aligned reduction targets" is appropriate "at the [general] plan level …." It also defends its decisions to categorize emissions by sector and assuming "reductions from statewide programs" "will be equally effective in Fresno as [in] the state as a whole …."

We agree Fresno may categorize emissions by sector and fairly assume statewide reduction programs will *effectively* apply in the city—"a lead agency enjoys substantial discretion in its choice of methodology." (*Newhall Ranch, supra,* 62 Cal.4th at p. 228.) However, we disagree the PEIR complies with the *Newhall Ranch* decision. Ultimately, Fresno failed to substantiate its analytical assumption the state's GHG emission targets were appropriate for Fresno itself.

It is true *Newhall Ranch* explicitly sanctions, as proper under CEQA, using "statewide goal[s] for greenhouse gas reduction, rather than a numerical threshold" to evaluate a project's GHG emissions. (*Newhall Ranch, supra,* 62 Cal.4th at p. 221.) The case further explains, however, that substantial evidence must support the conclusion the project-at-issue's reduction target is equally effective "as [the target] for the entire state population and economy." (*Id.* at pp. 225-226.)

The reason for an adequate, fuller analysis is because "a greater degree of reduction may be needed from new land use projects than from the [state] as a whole … 'given that past and current sources of emissions, which are substantially less efficient than [new developments], will continue to exist and emit' " GHG. (*Newhall Ranch, supra,* 62 Cal.4th at p. 226.) An EIR cannot "simply assume that the level of effort required in one context … will suffice in the other …." (*Id.* at p. 227.) An EIR must disclose *why* the same target reduction is appropriate because, for example, development

29.

"density averages" in land use at the statewide level may differ from a specific location within the state.  (*Id.* at pp. 226-227.)

Here, the PEIR does not explain why the "[s]tate-aligned target" metric is appropriate for the City's general plan.  Fresno attempts to distinguish *Newhall Ranch* as a case involving "a development with specific project characteristics" and not a general plan.  The distinction is immaterial in our view as CEQA does not apply any less to a large city's general plan.

For support, Fresno turns to *Tsakopoulos Investments, LLC v. County of Sacramento* (2023) 95 Cal.App.5th 280.  There, the Court of Appeal recently upheld an EIR because it "*did not compare the project's greenhouse gas emissions to the statewide business-as-usual goal ….*"  (*Id.* at p. 307, emphasis in original.)  Instead, the lead agency there "developed [local] thresholds of significance for different sectors and then compared the project's emissions against those numeric thresholds of significance." (*Ibid.*)

In contrast, Fresno here did compare its projected GHG emissions to the statewide goal.  Although it properly calculated projected emissions by categorizing local sectors, it did not calculate any local significance threshold and simply applied the state's reduction goal.  Because this approach—assuming the state's goal applies locally without supporting evidence—was rejected in *Newhall Ranch, supra,* the PEIR fails to comply with CEQA.  The fact this case involves a program EIR does not alter the law.

## C.  Analyzing GHG Emissions Over the Project's Lifetime

Alliance faults the PEIR for "fail[ing] to analyze the General Plan's GHG emissions over the lifetime of the [p]roject."  It argues the PEIR "admits that 'General Plan growth rate would result in buildout by the year 2056' " but only analyzes emissions through 2035.

Fresno argues "[t]here is no law requiring [it] to project GHG emissions for General Plan buildout in 2050 or beyond."  It also suggests its "projections through

2035 … correspond[] to the … General Plan[, 2035] horizon" year. We agree Fresno was not *required* to analyze emissions through 2050 or beyond, and its decision not to do so is justifiable.

"In determining the significance of a project's greenhouse gas emissions … [a lead] agency's analysis should consider a timeframe that is appropriate for the project." (Guidelines, § 15064.4, subd. (b).) Here, 2035 is an appropriate timeframe for two reasons. One, 2035 projections underlie the original general plan as they formed the basis for analysis under the MEIR. Two, the new PEIR does not eschew the 2050 target.

The PEIR explicitly acknowledges, multiple times, the state's 2050 goal to reduce emissions to 80% below 1990 levels, and that "continued reduction goals should be implemented to keep the State on a path toward the 2050 goal." As noted, the state has targeted emission reductions for 2030 and 2050. The City here selected reducing emissions in 2035, beyond those required in 2030, as an interim target and benchmark toward achieving the 2050 goal.

Because there is currently no specific statewide plan or law in place to achieve the 2050 emissions-reduction goal, and the City uses 2035 as an interim target year on its "path toward the 2050 goal," analysis through 2035 is not improper. (Cf. *Cleveland, supra,* 3 Cal.5th at p. 517 [lead agency properly declined "to adopt the 2050 goal as a measure of significance"].) As stated in the PEIR, the interim 2035 target will allow Fresno "to develop long-term strategies to continue GHG reductions."

In sum, Fresno has not ignored the state's 2050 goal in reducing GHG emissions under the general plan. Rather, it explicitly selected an interim year by which to achieve advanced reductions and reassess strategies at that point. That interim year is an appropriate timeframe in this case. (Guidelines, § 15064.4, subd. (b).)

### D. Business-as-Usual Projections Do Not Lack Foundation

Alliance argues the PEIR "violates CEQA by failing to include the full scope of emissions from development under the General Plan." It contends the PEIR's

31.

"population-based metrics" to project growth fail to account for "industrial development" in the future and its attendant " 'thousands of [daily] … truck trips.' "

Fresno counters its "methodology" choice to project growth based on population is entitled to deference. It also asserts its methodology properly accounts for industrial development. We agree.

Again, "[a] lead agency enjoys substantial discretion in its choice of methodology." (*Newhall Ranch, supra,* 62 Cal.4th at p. 228.) The City here chose to categorize emissions by sector, i.e., transportation, residential, industrial, etc. The PEIR adequately discloses sectors including transportation, industrial, commercial capture the projected emissions from future industrial development.

Alliance bears the burden to prove Fresno's methodology does not account for future industrial development. It has failed to discharge that burden. Although the PEIR is not perfect in this regard, Fresno did not abuse its discretion in selecting this methodology and the PEIR contains enough information to perform its public-informing function—here, that its projections are based on population growth and account for growth in industry and attendant transportation. (*Sierra Club, supra,* 6 Cal.5th at p. 522 [courts do not demand "perfection" but look for " ' " 'adequacy, completeness, and a good faith effort at full disclosure.' " ' "].)

**E. GHG Emission Mitigation Measures Are Ineffective**

As noted, the PEIR mitigates the general plan's GHG emissions via its GHG Reduction Plan and checklist. Alliance suggests the plan and checklist "do not indicate that a future project proponent need do anything more than fill out the [c]hecklist." In other words, Alliance believes the checklist "does not actually guarantee any mitigation."

Fresno points out GHG-1.1—the GHG emissions mitigation measure in the PEIR—requires projects to implement all applicable measures in the checklist. It contends any inconsistency with the checklist will require "a project-specific GHG analysis, including quantification of existing and projected GHG emissions attributable to

32.

that particular project."  It adds, "[t]o get below a level of significance, additional mitigation beyond the GHG Plan would be required as part of that future environmental review for that project, or project features would have to be incorporated to be below a level of significance."

In our view, contrary to Fresno's argument on appeal, the problem is neither GHG-1.1 nor the GHG Reduction Plan actually demand projects inconsistent with designated land uses achieve GHG emissions "below" a significant level.  While inconsistent projects must generate their own GHG emissions analysis, it does not follow reducing emissions to a less-than-significant level is also required.

Put simply, the PEIR does not assure mitigation will occur because the checklist allows non-land-use-conforming projects to move forward while emitting GHG at a level deemed significant so long as they otherwise demonstrate consistency with various general plan policies.  This approach violates CEQA as it demonstrates internal inconsistency with the PEIR's finding GHG mitigation will result in a less than significant impact on the environment.[18]  (§ 21081.6, subd. (b) [mitigation measures must be "fully enforceable"]; Guidelines, § 15126.4, subd. (a)(2) [same]; see *Sierra Club, supra,* 6 Cal.5th at p. 523 ["Mitigation measures need not include precise quantitative performance standards, but they must be at least partially effective, even if they cannot mitigate significant impacts to less than significant levels."].)

### F.  GHG Reduction Plan and Future Streamlining

CEQA specifically permits "[l]ead agencies [to] analyze and mitigate the significant effects of greenhouse gas emissions at a programmatic level, such as in a general plan, a long range development plan, or a separate plan to reduce greenhouse gas emissions.  Later project-specific environmental documents may tier from and/or

---

[18] The possibility the checklist allows approval of projects with GHG emissions significantly impacting the environment is the sole error we find on this point.  We find no other error with GHG-1.1 and the checklist.

incorporate by reference that existing programmatic review." (Guidelines, § 15183.5, subd. (a).)

The CEQA Guidelines provide, "A plan for the reduction of greenhouse gas emissions should:

> "(A) Quantify greenhouse gas emissions, both existing and projected over a specified time period, resulting from activities within a defined geographic area;
>
> "(B) Establish a level, based on substantial evidence, below which the contribution to greenhouse gas emissions from activities covered by the plan would not be cumulatively considerable;
>
> "(C) Identify and analyze the greenhouse gas emissions resulting from specific actions or categories of actions anticipated within the geographic area;
>
> "(D) Specify measures or a group of measures, including performance standards, that substantial evidence demonstrates, if implemented on a project-by-project basis, would collectively achieve the specified emissions level;
>
> "(E) Establish a mechanism to monitor the plan's progress toward achieving the level and to require amendment if the plan is not achieving specified levels;
>
> "(F) Be adopted in a public process following environmental review." (Guidelines, § 15138.5, subd. (b)(1).)

"Once an agency has adopted such a plan, it 'may fulfill its duty under CEQA to consider the significance of an individual project's greenhouse gas emissions by analyzing whether the project is consistent with the broader plan. If a project is found to be consistent with the broad plan, that finding provides sufficient evidence for the agency to conclude the project has no significant impact due to greenhouse gas emissions.' " (*IBC Business Owners for Sensible Development v. City of Irvine* (2023) 88 Cal.App.5th 100, 127.)

## A. Additional Background

The GHG Reduction Plan recognizes "[r]egular monitoring is important to ensure programs function as they were originally intended." It states Fresno "would be responsible for developing a protocol for monitoring the effectiveness of emission reduction programs as well as for undertaking emission inventory updates." It then identifies "key components of a GHG Plan monitoring program," and notes Fresno "could compile data obtained from the checklist annually to monitor and track the progress on GHG reductions," or transform an existing "permit tracking system … into a GHG reduction monitoring tool …."

## B. Analysis

As noted, the GHG Reduction Plan in this case is intended to serve as a programmatic analysis from which to streamline future GHG analysis. Alliance contends the plan "fails to meet [the above] requirements." It argues the plan "fails to adequately quantify the full scope of GHG emissions for the lifetime of the projected buildout of the General Plan," "fails to set reduction targets through project buildout," and "substantial evidence does not support the GHG Plan's inventory of projected emissions, the adjusted statewide target for emissions in Fresno, nor the conclusion that the specified reduction measures will achieve the reduction targets."

We have already analyzed these contentions. (See **VIII., B., C., D., & E.,** *ante*.) We disagree the plan fails to analyze GHG emissions through the project's lifetime, fails to set reduction targets through the project's lifetime, and fails to support its selected inventory of projected emissions. We agree the plan improperly adopts a statewide target as appropriate for Fresno[19] and also that GHG emissions reduction measures will effectively achieve that improper target.

_____

[19] To reiterate, a statewide target *might* be appropriate for Fresno, but substantial evidence, i.e., analysis, must support that conclusion. The PEIR in this case does not demonstrate the required analysis.

Alliance also argues the plan "does not establish a mechanism to monitor progress" which would "require amendment [to] the plan [if it] is not achieving" its goal. (See Guidelines, § 15183.5, subd. (b)(1)(E).)  Fresno counters the plan "provides for a mechanism to monitor … progress towards achieving reduction targets and … specifies the tracking tools used to monitor the plan's progress."

The GHG plan clearly does not establish a mechanism to monitor progress. Rather, it recognizes various components to a monitoring mechanism and suggests methods to track progress.  It does not, however, establish an actual program.  For all these reasons, the plan is not eligible to streamline GHG analysis.[20]

## IX.  Vehicle Miles Traveled (VMT)

Relative to VMT, Alliance argues the PEIR fails to mitigate VMT and fails to analyze "impacts on pedestrians, cyclists, and transit riders."  We address each in turn.

### A.  Additional Background

"In 2018, California adopted … Guidelines section 15064.3, which changed the measure of traffic impact from level of service (LOS) to vehicle miles traveled []."  (*Olen Properties Corp. v. City of Newport Beach* (2023) 93 Cal.App.5th 270, 275, fn. omitted.) VMT "refers to the amount and distance of automobile travel attributable to a project." (Guidelines, § 15064.3, subd. (a).)

According to the PEIR, future projects creating "significant impacts under VMT would be required to address their impacts through … measures such as car sharing, improved transit, enhanced bicycle infrastructure, design modifications, or mitigation

---

[20] Fresno also contends the GHG Reduction Plan is beyond challenge because such a plan is not mandatory under CEQA.  The City also points out Guidelines section 15183.5 states such plans "should," not must or shall, include the elements discussed above.  The California Supreme Court has held such plans are viable to streamline future analysis only "if sufficiently detailed and adequately supported …." (*Newhall Ranch, supra,* 62 Cal.4th at p. 230.)  The GHG Plan in this case insufficiently supports its statewide reduction targets and fails to include a mechanism to monitor progress—these faults render it inadequate.  (*Ibid.*)

fees ….” Fresno adopted local “VMT thresholds, allowing “project impacts [to] be evaluated to determine the significance and identify mitigation measures ….”

The PEIR concludes “continued implementation of the … General Plan would result in a significant impact related to … transportation impacts ….” It then “recommend[s] that when [Fresno] plans to update its General Plan Mobility and Transportation Element, it should strive to lower the General Plan (2035) VMT per capita compared to existing conditions.” Fresno's “[g]uidelines for VMT [t]hresholds,” mentioned by the PEIR, “include[] a summary of the VMT mitigation measures and project alternatives that could be used to reduce VMT at a project-level.” “[B]ecause … future projects [were] unknown …, VMT impacts [were found] significant and unavoidable at a plan level.”

Elsewhere, the City officially found VMT impacts were “significant and unavoidable” due to infeasible mitigation and alternatives. In its statement of overriding considerations, it stated “[n]o feasible mitigation measures [were] available to mitigate [transportation impacts] to a less-than-significant level at the plan level.” “The City's Guidelines for VMT Thresholds,” however, as noted in the statement, “include[d] a summary of … VMT mitigation measures and project alternatives that could be used to reduce VMT at a project-level.”

**B. VMT Mitigation**

Alliance points out the PEIR “does not propose that any VMT mitigation be adopted as part of the General Plan's environmental review.” Fresno argues it found VMT impacts were “significant and unavoidable at the plan level.” It claims that “finding is supported by substantial evidence in the record, including that in 2020 [it] developed and adopted separate VMT CEQA significance thresholds ….” Ultimately, it concludes: “Because future development projects are unknown [], VMT impacts are better analyzed at the project level, which falls in line with the tiering approach established by CEQA.”

"[A]n EIR's designation of a particular adverse environmental effect as 'significant' does not excuse [its] failure to reasonably describe the nature and magnitude of the adverse effect." (*Cleveland, supra,* 3 Cal.5th at p. 514.) The PEIR here fails utterly to discuss any mitigation, instead leaving the discussion for another day. This approach violates CEQA—there is no substantial evidence in the record explaining why mitigation at the plan level is infeasible. For example, even if "future development projects are unknown," there is no explanation why plan-level mitigation measure is infeasible.

Tiering is not an excuse to defer environmental analysis. (*Vineyard, supra,* 40 Cal.4th at p. 431.) "CEQA's demand for meaningful information 'is not satisfied by simply stating information will be provided in the future.' " (*Ibid.*) "[I]f known impacts are not analyzed and addressed in a program EIR, they may potentially escape analysis in a later tier EIR." (*San Diego, supra,* 17 Cal.App.5th at p. 440.)

To be sure, increased VMT, as Fresno necessarily acknowledges, is a reasonably foreseeable effect of continuing to implement the general plan. (Guidelines, § 15152, subd. (b) ["Tiering does not excuse the lead agency from adequately analyzing reasonably foreseeable significant environmental effects of the project and does not justify deferring such analysis to a later tier EIR or negative declaration."].) The dearth of information in the PEIR explaining *why* VMT mitigation is infeasible at the general plan level and instead deferring that discussion to future EIRs violates CEQA.[21] (See *Vineyard, supra,* 40 Cal.4th at p. 445 [EIR must "disclose 'the "analytic route the … agency traveled from evidence to action …." ' "].) In other words, simply concluding

_____

[21] Neither does the discussion in the PEIR qualify as deferred mitigation under Guidelines section 15126.4. (See, e.g., *King & Gardiner, supra,* 45 Cal.App.5th at p. 856 ["generalized goal" of mitigation is not a "specific performance" standard].) We do not necessarily preclude Fresno from concluding VMT mitigation is infeasible at the general plan level, rather we hold only that the PEIR fails to justify that conclusion.

mitigation is infeasible, without adequate discussion supported by evidence, is insufficient to comply with CEQA.

## C. Fully Analyzing Traffic-Related Impacts

Separately, Alliance challenges the PEIR's alleged failure to "analyze or mitigate significant impacts on pedestrians, cyclists, and transit riders." It contends it presented evidence "show[ing] a sharp increase in pedestrian fatality rates in recent years, as well as increases in risks to cyclists," risks it attributes to industrial development.

Fresno defends the PEIR by claiming CEQA does not require an EIR for a general plan to analyze impacts from increased traffic on pedestrians, cyclists, and transit riders. Specifically, it contends "CEQA does not require an agency to turn a program EIR for its existing general plan into a transportation policy document or infrastructure improvement program, requiring construction of sidewalks, street lights, storm drains, and bike lanes …." We find otherwise.

### i. Additional Background

Various individuals and groups commented on the fact the PEIR did not address pedestrian safety. For example, a local school district superintendent complained the "PEIR fails to analyze how the General Plan impacts pedestrian and bicyclist safety," adding that "[t]his [was] a huge issue for neighborhoods burdened by truck traffic from new and existing warehouses and other industrial development."

Another resident wrote a letter describing increased traffic and "truck terminals and truck stops" built over "the last few years …." She mentioned "construction cover[ing her] house with dust," complained "truck traffic during … construction was … extremely loud," "construction caused vibrations" strong enough to shake her house, "pedestrians" in the "neighborhood" are fearful to walk, and "noticed more accidents because of the traffic from … warehouses."

Similarly, Alliance commented the PEIR "fails entirely to analyze how implementation of the General Plan would affect programs, plans, ordinances, and

policies pertaining to bicycles, pedestrians[,] and transit." It noted "[t]he failure to address pedestrian safety is particularly concerning given recent trends in pedestrian fatalities."

An apparent expert retained by Alliance authored a report as part of Alliance's comment on the PEIR. The expert asserted "recent statistics reveal that pedestrians and bicyclists are increasingly in danger" on the road, but the PEIR "includes no consideration of potential safety issues for these individuals."

Fresno did respond to these comments. In sum, it stated the PEIR "does not address potential project-level impacts resulting from future projects that would be developed under the approved General Plan." In other words, Fresno did not believe pedestrian impacts were a program-level issue. It also stated the "proposed project … evaluates potential environmental impacts at a program level" and that "program-level analysis allows for future analysis of projects to use the PEIR as a starting point, but requires that specific impacts to pedestrians, cyclists, and transit riders be analyzed during review of future discretionary projects."

### ii. Analysis

"An EIR must set forth in detail '[a]ll significant effects on the environment of the proposed project.' " (*Visalia Retail, LP v. City of Visalia* (2018) 20 Cal.App.5th 1, 13 (*Visalia*).) " '[I]n preparing an EIR, the agency must consider and resolve *every fair argument* that can be made about the possible significant environmental effects of a project ....' " (*Ibid.*)

Because Fresno did not consider and resolve whether traffic-related impacts to pedestrians, cyclists, and transit riders were significant effects of the project, the initial question for us is whether there is a fair argument, based on substantial evidence in the record as a whole, that there may be significant effects. (See *Visalia, supra,* 20 Cal.App.5th at pp. 13, 17.) We conclude the record discloses the requisite fair argument.

The record contains significant evidence industrial development under the general plan has resulted in increased traffic, impacting pedestrians, cyclists, and transit riders. Various individuals complained the city was unsafe for pedestrian travel. An alleged expert witness illuminated the dangers to pedestrians generally and highlighted the PEIR's failure to address those dangers.

Again, tiering is not an excuse to defer environmental analysis. (*Vineyard, supra,* 40 Cal.4th at p. 431.) "CEQA's demand for meaningful information 'is not satisfied by simply stating information will be provided in the future.' " (*Ibid.*) CEQA requires a "lead agency [to] adequately analyz[e] reasonably foreseeable significant environmental effects of the project …." (Guidelines, § 15152, subd. (b).) The PEIR here does not justify its decision not to address pedestrian impacts at the program level.

The Second District Court of Appeal has found error in a lead agency's failure to consider or address a project's possible "significant impacts to pedestrian safety." (*City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 395.) Fresno attempts to distinguish the case by arguing it "cannot be extrapolated to apply [to] a program EIR analyzing a large city's General Plan …." It also points out "Appendix G of the Guidelines does not require specific analysis of General Plan implementation on bicycle and pedestrian facilities." We disagree for two reasons.

First, there is no reason to believe CEQA does not require analyzing a project's potential significant impacts on pedestrian safety. The Guidelines make no exception for program EIRs to forego analyzing reasonably foreseeable impacts. (See *San Diego, supra,* 17 Cal.App.5th at p. 440.) Second, Appendix G is simply a "a sample form that may be tailored to satisfy [an] individual agenc[y's] needs and project circumstances." The form explicitly notes "[s]ubstantial evidence of potential impacts that are not listed … must also be considered." (Guidelines, Appendix G.)

In sum, we hold the record contained sufficient evidence to support a fair argument traffic-related impacts to pedestrians were potentially significant, even at the

41.

program level.  Accordingly, Fresno must consider or address the potential impact in the PEIR.

## X. Groundwater Mitigation

The PEIR acknowledges impacts to groundwater are potentially significant.  It states: "Implementation of the project would substantially decrease groundwater supplies or interfere substantially with groundwater recharge …."  To address the potential significant impact, the PEIR contains one mitigation measure related to groundwater— HYD-2.1.  It states, in full, "The City shall continue to be an active participant in the North Kings Groundwater Sustainability Agency and the implementation of the North Kings Groundwater Sustainability Plan in order to ensure that the Kings Subbasin has balanced levels of pumping and recharge."[22]  It concludes this mitigation reduces impacts to groundwater to a less-than-significant level.

Alliance contends the mitigation measure "is vague, speculative, unenforceable, and ineffective."  It argues sustainable groundwater management by 2040, as discussed

---

[22] The Legislature enacted the Sustainable Groundwater Management Act in 2014.  (Wat. Code, § 10720 et seq.)  "The Legislature's stated intent in enacting the Sustainable Groundwater Management Act was 'to do all of the following: [¶] (a) To provide for the sustainable management of groundwater basins. [¶] (b) To enhance local management of groundwater consistent with rights to use or store groundwater and Section 2 of Article X of the California Constitution.  … [T]o preserve the security of water rights in the state to the greatest extent possible consistent with the sustainable management of groundwater. [¶] (c) To establish minimum standards for sustainable groundwater management. [¶] (d) To provide local groundwater agencies with the authority and the technical and financial assistance necessary to sustainably manage groundwater. [¶] (e) To avoid or minimize subsidence. [¶] (f) To improve data collection and understanding about groundwater. [¶] (g) To increase groundwater storage and remove impediments to recharge. [¶] (h) To manage groundwater basins through the actions of local governmental agencies to the greatest extent feasible, while minimizing state intervention to only when necessary to ensure that local agencies manage groundwater in a sustainable manner.' (Wat. Code, § 10720.1.)" (*Center for Biological Diversity v. County of San Bernardino* (2016) 247 Cal.App.4th 326, 335-336.)

below, "does not alleviate the significant impact that will have already deprived numerous households of access to groundwater supply in the interim."

The City argues impacts to groundwater are addressable only "by ensuring" the subbasin "is managed in a sustainable fashion …." It believes HYD-2.1 achieves exactly that, and "[c]ompliance with state law" designed to achieve groundwater sustainability is sufficient mitigation for implementing its general plan, justifying its chosen mitigation as compliant with CEQA. Fresno also contends, "to the extent" Alliance challenges the groundwater *plan* itself, such plans are exempt from "CEQA review."

We conclude HYD-2.1 is an appropriate, enforceable mitigation measure. However, the PEIR fails to justify not discussing any specific groundwater mitigation in the interim, i.e., prior to 2040. No substantial evidence supports the implied conclusion impacts to groundwater in the interim are reduced to a less-than-significant level.

## A. Additional Background

The PEIR states Fresno "is creating an overdraft of the Kings Groundwater Sub-basin aquifer as defined by the California State Department of Water Resources." "In November 2019," Fresno adopted the North Kings Groundwater Sustainability plan "with the sustainability goal to ensure that by 2040 the Kings Groundwater Subbasin …, in which Fresno is located, is being managed in a sustainable manner to maintain a reliable water supply …." "[C]ontinued implementation of the … General Plan could result in significant impacts to groundwater levels within the Kings Sub-basin if the [projected] increase in water demand is met through an increase of water supply from increased groundwater pumping."

During the environmental review process, Alliance submitted multiple comment letters related to groundwater sustainability. In the first, it provided a "[f]ocused [t]echnical [r]eview" of the North Kings Groundwater Sustainability Plan. It concluded the plan did "not include a thorough analysis of impacts to key beneficial users in the subbasin, particularly domestic well users and members of disadvantaged

43.

communities ….'" Alliance lamented the fact the plan did " 'not require … maintain[ing] current water levels or prevent[ing] any wells from going dry[].' "

In a second letter, Alliance described "numerous households and entire neighborhoods … lost access to water in their homes as their wells ran dry" in the years leading up to the general plan amendment. It noted the Groundwater Sustainability Plan allowed for "a 107-foot decline in groundwater levels" "which can mean the difference between flowing and dry taps," and the fact "[a] potentially balanced water demand in 20 years will not alleviate the significant impact that occurs should households lose access to water supply in the present."

Others, too, commented on groundwater issues. For example, at a planning commission meeting during the certification process, an individual bemoaned he "recently had three residential wells go dry," attributing the loss to "all this development," e.g., "the Amazon facility …." Fresno essentially responded to all groundwater mitigation issues by claiming "the underground movement of water within the aquifer is not anticipated to affect domestic wells" because groundwater "balance[]" will obtain by "the year 2040 …."

### C. Analysis

"[A] condition requiring compliance with regulations is a common and reasonable mitigation measure, and may be proper where it is reasonable to expect compliance." (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 906.) The mitigation measure in this case properly commits Fresno to comply with state law and the regional groundwater sustainability plan. (See Water Code, § 10720 et seq.) There is no reason to believe Fresno will not comply with state law.

Where the PEIR comes up short, however, is in its failure to assess groundwater levels relative to domestic wells throughout the city prior to 2040. As described above, Fresno was aware people expressed concern about groundwater levels in the present—the record contains ample evidence regarding wells *today*. The record does not currently

justify concluding interim impacts to domestic wells are less than significant due to participation in the North Kings Groundwater Sustainability Agency and implementing its attendant Plan.

For example, the PEIR does not explain why no mitigation measures specifically addressing groundwater between the present and 2040 are considered. We recognize it is possible no such mitigation is feasible but, if so, then the PEIR must adequately explain why and support that conclusion with evidence.[23] At bottom, a conclusory statement that groundwater use will achieve balance in 2040 is insufficient to alleviate a present concern.

## XI. Project Alternatives

Alliance complains the PEIR "fails to analyze a reasonable range of alternatives. Fresno argues "CEQA does not require consideration of alternatives to an already approved project." It otherwise contends the alternatives "considered were reasonable in the context of the project being analyzed." We agree with Alliance.

### A. Additional Background

The PEIR considered two alternatives: a "No Project Alternative" and a "Net Zero Energy Consumption Alternative." "Under the No Project Alternative, development within the Planning Area would continue to be implemented in accordance with the [existing] General Plan; however, changes to the Mobility and Transportation Element"—reflecting VMT analysis—"and updates to the Greenhouse Gas Reduction Plan would not be implemented." "Under the No Project Alternative, similar to the proposed project, development would continue as allowed under the [existing] General Plan because no changes to land use designations would occur." "Overall, impacts resulting from the No Project Alternative would be similar to the proposed project, as

---

[23] It is also possible groundwater concerns are unfounded. That is a question for a lead agency to address. We hold only that the record contains enough evidence to warrant a deeper look.

significant unavoidable impacts related to aesthetics, agricultural resources, air quality, noise, transportation, and utility and service systems would continue to occur."

"Under the Net Zero Energy Consumption Alternative, both residential and non-residential development would be required to achieve net zero energy consumption in 2020." "By achieving net zero energy consumption for non-residential development in 2020, the city would reduce overall GHG emissions." "Under this alternative, impacts associated with greenhouse gas emissions would be reduced by requiring that development achieve a net zero energy consumption. Although the proposed project would not result in potentially significant impacts related to energy, this alternative would require less energy consumption than continued implementation of the [existing] General Plan because, new non-residential development would be required to achieve net zero energy consumption ten years before the required compliance year of 2030." (See Cal. Code Regs., tit. 24, pt. 11.) "As a result, potential impacts resulting from the Net Zero Energy Consumption Alternative would be less than the proposed project, potential impacts related to energy and greenhouse gases would be fewer."

Fresno rejected both alternatives. It rejected the No Project Alternative because it achieved the project's objectives at "a lesser level" and failed to implement "current … law" regarding VMT. It rejected the Net Zero Energy Consumption Alternative because it was "not … feasible to require next [sic] zero energy consumption in 2020."

**B. Analysis**

We first address Fresno's argument CEQA did not require it to consider alternatives in this case. Because we disagree with that argument, we then analyze the alternatives Fresno did consider.

### i. Requirement to Consider Alternatives

Fresno claims "CEQA does not mandate consideration of feasible alternatives to [a] project" where that project is "not being considered for approval …." It bases this claim on *Conservation, supra,* 36 Cal.App.5th 210. There, the appellate court rejected

46.

several challenges because it concluded the lead agency did not carry out a program or project as defined under CEQA. (*Id.* at p. 227.) Instead, the lead agency simply "overs[aw] a regulatory program" and prepared a unique EIR "to provide the public with detailed information" "about the environmental effects of well stimulation treatments such as hydraulic fracturing and acid well stimulation" pursuant to a bill passed by the Legislature. (*Id.* at p. 227, 217.)

In contrast, the lead agency in this case—Fresno—clearly is carrying out its general plan. To carry out its general plan, it chose to adopt a new PEIR, instead of continuing to use its older MEIR. (See § 21157.6 [lead agency may utilize older MEIR if it makes specific findings under statute].) Accordingly, the decision to adopt a PEIR entails fully complying with CEQA and its alternatives sections. (See **III.,** *ante*.)

### ii. Alternatives Analysis

"CEQA requires an EIR to identify feasible alternatives that could avoid or substantially lessen the project's significant environmental effects. (§§ 21002, 21100, subd. (b)(4).) '[I]t is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects[.]' (§ 21002.) [¶] The EIR must describe a range of reasonable alternatives to the project 'which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project.' (Guidelines, § 15126.6, subd. (a).) The EIR must evaluate the alternatives' comparative merits. (Guidelines, § 15126.6, subd. (a).)" (*Save Our Capitol! v. Department of General Services* (2023) 87 Cal.App.5th 655, 702-703 (*Save*).)

"CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts …." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 566; *Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 741 (*Tiburon*).) "An EIR

need not consider every conceivable alternative to a project or alternatives that are infeasible." (*Bay-Delta, supra,* 43 Cal.4th at p. 1163.) " 'There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason.' " (*Ibid.*)

"The rule of reason 'requires the EIR to set forth only those alternatives necessary to permit a reasoned choice' and to 'examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project.' [Citation.] An EIR does not have to consider alternatives 'whose effect cannot be reasonably ascertained and whose implementation is remote and speculative.' " (*Bay-Delta, supra,* 43 Cal.4th at p. 1163.) "[A]n EIR should not exclude an alternative from detailed consideration merely because it 'would impede to some degree the attainment of the project objectives.' " (*Id.* at p. 1165; Guidelines, § 15126.6.)

A lead agency is not "required to consider specific alternatives proposed by members of the public or other outside agencies." (*Save, supra,* 87 Cal.App.5th at p. 703.) "We will uphold an agency's choice of alternatives unless they 'are manifestly unreasonable and … do not contribute to a reasonable range of alternatives.' " (*Tiburon, supra,* 78 Cal.App.5th at p. 741.) "An agency's finding of infeasibility for this purpose is 'entitled to great deference' and ' "presumed correct." ' " (*Los Angeles Conservancy v. City of West Hollywood* (2017) 18 Cal.App.5th 1031, 1041.)

The alternatives discussion in the PEIR here does little to meaningfully "inform[] decisionmaking and public participation." (Guidelines, § 15126.6, subd. (a).) Although the "No Project" alternative is necessary to evaluate, here it results in little change because the general plan already exists. The only difference between the amended general plan and the prior general plan was replacing level-of-service-traffic-analysis language with VMT standards. In sum, the "No Project" alternative does not contribute to "a range of reasonable alternatives" *in this case*.

48.

The "Net Zero" alternative, on the other hand, is an "environmentally superior alternative" project. (Guidelines, § 15126.6, subd. (e)(2).) The City, however, rejected it as infeasible without any meaningful discussion. The PEIR does not explain why it is infeasible, or even why it could not implement the "Net Zero" mandate in a year interim to 2030. No evidence supports the City's infeasibility conclusion.

Taken together, the two alternatives discussed in this matter do not comprise a reasonable range of alternatives. The alternatives discussion here is inadequate when judged against the rule of reason because it fails to inform the public regarding the proposed project, i.e., amended general plan with intent to streamline environmental analysis under new PEIR. To support its conclusion regarding alternatives, the City should explain why no alternatives are feasible, supporting the explanation with evidence, or it should discuss at least one potentially feasible alternative.

## CONCLUSION

The PEIR in this case contains several prejudicial errors: 1) air quality mitigation measures AIR-2.1, 2.2, and 3.1 violated Guidelines section 15126.4 because they do not contain objectively enforceable standards, 2) it inappropriately assumes statewide-GHG-reduction targets are appropriate for Fresno, undermining its ability to streamline GHG analysis for future projects, 3) the conclusion VMT mitigation is infeasible is not justified, 4) it failed to analyze traffic-related impacts on pedestrians, cyclists, and transit riders, notwithstanding evidence in the record indicating a potential significant impact, 5) it failed to address groundwater mitigation in the present, and 6) it failed to consider a reasonable range of alternatives. Under section 21168.9, subdivision (b), correcting these errors is "necessary to achieve compliance with" CEQA.

## **DISPOSITION**

The City's request for judicial notice is granted.[24]

The judgment is reversed and the matter remanded for further proceedings consistent with this opinion. The trial court is directed to vacate the order denying the petition for writ of mandate and enter a new order granting the petition.

The trial court shall issue a peremptory writ of mandate compelling the City to (1) set aside resolution Nos. 2021-269 and 2021-270 which certified the PEIR was completed in compliance with CEQA and adopted the general plan amendment, and (2) take corrective action consistent with this opinion prior to certifying a revised PEIR was completed. (§ 21168.9, subd. (b).)

The peremptory writ of mandate shall state the trial court retains jurisdiction over the proceedings by requiring the City to file a return to the writ. (§ 21168.9, subd. (b).) The trial court may, in its discretion, require or allow the City to file an initial return explaining the action it intends to undertake to satisfy the issued writ.

Costs are awarded to Alliance. (Cal. Rules of Court, rule 8.278.)


SNAUFFER, J.

WE CONCUR:


FRANSON, Acting P. J.


MEEHAN, J.

---

[24] The City filed a request to judicially notice two exhibits from the trial court record and one exhibit relating to CEQA Guidelines. We grant the request.